BOONVILLE NATIONAL BANK, a Corporation, and JOHN T. CARLON, Receiver of Boonville National Bank, a Corporation, Appellants, v. MAUD THOMPSON, as Executrix of the Estate of MILTON THOMPSON.—99 S. W. (2d) 93.

Division Two, November 17, 1936.*

---

*NOTE: Opinion filed at May Term, 1936, June 30, 1936; motion for rehearing filed; motion overruled August 20, 1936; motion to transfer to Court en Banc filed; motion overruled at September Term, November 17, 1936.

1050

*D. W. Shackelford, John H. Windsor* and *Walter A. Raymond* for appellants; *Hume & Raymond* of counsel.

*Alfred M. Seddon, Charles M. Bush* and *Ryland, Stinson, Mag &
Thompson* for respondent.

COOLEY, C.—This suit was brought originally by the Boonville National Bank against Milton Thompson, for money had and received. Thereafter the bank went into receivership, the receiver being made party plaintiff. Thompson died and his widow as executrix was made party defendant. Amended petitions were filed from time to time, the case being finally tried on the fourth amended petition. The trial was to a jury. At the close of the plaintiffs' evidence plaintiffs took a nonsuit with leave to move to set the same aside. Such motion was duly filed, was overruled by the court and plaintiffs appealed. Respondent has filed here a motion to dismiss the appeal, contending that the nonsuit was voluntary, hence that no appeal lies therefrom. Appellant contends that the nonsuit was involuntary. If so the appeal was properly taken. A final judgment of dismissal was duly entered. Before proceeding to the merits of the case we shall dispose of the motion to dismiss the appeal.

The record before us shows that at the close of plaintiffs' evidence "the defendant requested the court to give an instruction in the nature of a demurrer to the evidence. The court marked the same 'given,' to which plaintiffs excepted, and thereupon and before said instruction was read to the jury, plaintiffs, deeming the ruling of the court precluded them from recovery, suffered and took an involuntary nonsuit with leave to move to set the same aside." Said instruction was a peremptory direction requiring the jury to find for the defendant.

The bill of exceptions shows that immediately preceding the offering of said peremptory instruction and the court's ruling thereon this occurred: The plaintiffs announced that they rested their case, whereupon the court said to the jury:

"Gentlemen, under the view the court takes of the law under the facts in this case, whether the court is right or not we can never tell until the upper court passes upon it, but, in the view the court takes, there is nothing further for you to consider in this case. You will be excused now. Please report to the Jury Waiting Room on the fifth floor."

Then followed the offering by defendant of the peremptory instruction, the court's action thereon, plaintiffs' exceptions, and the nonsuit. No question is or can be raised as to the timeliness or sufficiency of plaintiffs' objections and exceptions to the court's action. The sole question on the motion to dismiss the appeal is, was said peremptory instruction "given" by the court, within the meaning of the law, so that the plaintiffs were then precluded from recovery, or, in order to make the nonsuit involuntary, from which an appeal would lie,

must they have waited until the instruction was actually read to the jury?

The statute, Section 967, Revised Statutes 1929 (Mo. Stat. Ann., p. 1240), provides that "when the evidence is concluded, and before the case is argued or submitted to the jury or to the court sitting as a jury, either party may move the court to give instructions on any point of law arising in the cause, which shall be in writing and shall be given or refused." It further provides that the instructions given shall be "carried by the jury to their room for their guidance to a correct verdict," and shall be by the jury returned into court at the close of their deliberations and filed by the clerk as part of the record. The statute says nothing about the court *reading* the instructions to the jury. Naturally, *refused* instructions would not be read or delivered to the jury, and in case a peremptory instruction is given, which leaves nothing for the jury to deliberate upon, it happens in practice usually, or at least frequently, that the jury, at the direction of the court, signs and returns the directed verdict without leaving the jury box. Now, at just what point in the procedure is such peremptory instruction to be deemed "given," thereby precluding the plaintiff from recovery? Must it be actually read to the jury?

In a recent decision the St. Louis Court of Appeals has so held, viz.: Owens v. Washington Fidelity National Ins. Co., 85 S. W. (2d) 193, which case was followed by the same court in Kane v. Kaysing Iron Works, 89 S. W. (2d) 532, 534. In the Owens case the court reviews a number of decisions of this court.

In that case portions of the record indicated that the court had merely "announced its intention to give and read the instruction in the nature of a demurrer to the evidence . . ." but had not actually given it. But another record entry showed that, as in the instant case, the court had marked the instruction "given," but that it was not read to the jury. Both cases seem to proceed upon the theory that such instruction cannot be deemed given until actually read to the jury. In the Kane case the court says, 89 S. W. (2d) l. c. 534:

"The doctrine deducible from the long line of decisions of our Supreme Court on this question is that, before a plaintiff can take an involuntary nonsuit, the court must actually 'give' to the jury the peremptory instruction offered by the defendant directing a verdict for the defendant. In other words, the court must actually read such instruction to the jury, and the record must show that such action was taken by the court; thereby precluding and preventing a recovery by plaintiff in that particular trial. The mere expression by the court of an intention to give such an instruction is not sufficient to make a nonsuit thereupon taken by a plaintiff an involuntary one, nor will the mere marking of the word 'given' on such an

instruction make the nonsuit involuntary if the record fails to show that such instruction was actually given and read to the jury by the court."

The Owens case cites the following decisions of this court: Greene County Bank v. Gray, 146 Mo. 568, 48 S. W. 447; McClure v. Campbell, 148 Mo. 96, 112, 49 S. W. 881, 885; Gray y. Ward, 234 Mo. 291, 295, 136 S. W. 405, 407; Hogan-Sunkel Heating Co. v. Bradley, 320 Mo. 185, 7 S. W. (2d) 255; Segall v. Garlichs, 313 Mo. 406, 281 S. W. 693. The cases cited and others of like tenor do hold that it is not sufficient in order to make a nonsuit involuntary that the court had merely indicated or expressed *an intention* to give a peremptory instruction to find for the defendant, but that such instruction must have been actually given. But in none of said cited cases, nor in any we have found, except said Owens and Kane cases, has this court or the Courts of Appeals said that such peremptory instruction must be *read* to the jury before it can be deemed given. In one case, Bank of Rockville v. Corbin, 276 S. W. 880, 881, the Springfield Court of Appeals intimates that such instruction is "given" if the court marks it as given. The court says: "The instruction to the jury directing a verdict for the defendant must be in writing and actually given by the court to the jury; that is, it must be actually given to the jury or marked by the court as given."

In Kelly-Goodfellow Shoe Co. v. Prickett, 84 Mo. App. 94, 100, this occurred: "The record shows that counsel for interpleader announced that the evidence was all in. 'Counsel for plaintiff presents demurrer to the court, and the court announced to counsel for interpleader that he would sustain the same. To which ruling of the court interpleader objected and excepted at the time and still excepts.'" The interpleader thereupon took a nonsuit with leave. The Court of Appeals said:

"This shows an involuntary nonsuit from which an appeal will lie. We interpret this quotation from the record to mean that the court did actually pass on the demurrer. The court announced the ruling in the words 'that he would sustain the same.' That means not that he would in the future sustain it, but that he did then sustain it. Such was the evident understanding of counsel for he excepted to the ruling and such was the understanding of the court for it allowed such exception."

This court in Lewis v. Center Creek Mining Co., 199 Mo. 463, 468, 97 S. W. 938, quoted the above language of the Court of Appeals, without apparent disapproval.

In the instant case it seems to us that when the court marked the peremptory instruction "given" it did more than merely indicate an intention to give it. We think the court thereby ruled—acted—upon the instruction—in effect gave it. Suppose the court had said,

"I hereby sustain defendant's demurrer and give this instruction." Would not that have been an actual *ruling?* The court did not so state in audible words, but did in substance and effect so state in writing, by marking the instruction "given." It is suggested that, after marking the instruction "given" the court might yet have reconsidered and refused to let it go to the jury. So, we apprehend, might a trial court reconsider and recall various rulings made in the progress of a trial, before verdict, such as in the matter of admission or rejection of evidence, the giving or refusing of instructions, etc., which does not alter the fact that the court had ruled upon such matters when originally presented. The statute should be given a reasonable and practical interpretation and application. On the record before us we think there can be no doubt that plaintiffs understood that the court had ruled upon the requested peremptory instruction, precluding them from recovery, not that it had merely expressed an intention so to rule, and that the court so understood. Plaintiffs duly excepted to the ruling and the exceptions were allowed. We think the nonsuit was involuntary. The motion to dismiss the appeal is overruled. The Owens and Kane cases, supra, insofar as they conflict with the views herein expressed, are disapproved.

Of the Merits.

This controversy grows out of the payment by plaintiff bank of certain checks or drafts drawn by one C. W. Nixon on the personal account of Milton Thompson in the Farmers' Trust Company at Lees Summit, Missouri. Thompson resided at Lees Summit and did his banking business there. Nixon resided at Boonville, where plaintiff bank was located. Thompson was a man of substantial means. Nixon, at the times here involved, was also considered a man of large means, and his son-in-law, E. B. Turner, seems also to have been regarded as a man of some wealth. At and for some time prior to the time of these transactions Nixon and Turner were engaged in business at and about Boonville under the name of Nixon Farm Mortgage Company, in which name they had a checking account in plaintiff bank. They did an extensive farm loan business and perhaps engaged in other enterprises, in which Thompson had no interest or concern. They both checked on that account, not only for their mutual business interests in which Thompson was not concerned but for living and other personal expenses, and the evidence indicates that other members of their families checked upon it. Some evidence indicates that it was simply Nixon's personal account, carried in the name of Nixon Farm Mortgage Company.

Indicating the theory upon which plaintiffs' case proceeds, they plead:

"That, continuously from June 23, 1925, until March 15, 1926, Milton Thompson and C. W. Nixon were members of a copartnership,

or joint adventure, existing for the purpose of acquiring, prospecting and mining certain mineral lands situated in the County of Camden and State of Missouri.

"That said copartnership, or joint adventure, conducted its business in relation to said mineral lands in the following manner:

"That said Milton Thompson advanced the money necessary to pay the current expenses of acquiring, prospecting and mining said mineral lands.

"That said Nixon supervised, controlled and directed the acquiring, prospecting and mining of said lands, and the payment of the current expenses thereof out of the moneys advanced by said Milton Thompson.

"That said copartnership or joint adventure arranged with the plaintiff bank that payment of said current expenses would be made by checks drawn against said checking account of said Nixon Farm Mortgage Company in said Boonville National Bank.

"That, to keep sufficient funds in said checking account of said Nixon Farm Mortgage Company to pay said current expenses, said E. B. Turner, as agent of said copartnership, or joint adventure, and in its behalf, from time to time, as necessity required, executed to said Boonville National Bank a note, and caused the amount, thereof to be placed to the credit of said Nixon Farm Mortgage Company; at the maturity of said note, said Milton Thompson drew in favor of said Nixon Farm Mortgage Company and delivered to it, his check against his account in The Farmers' Trust Company of Lees Summit, Missouri, for a sum equal to the amount of said note, and said Nixon Farm Mortgage Company endorsed and deposited said check in said Boonville National Bank to the credit of the Nixon Farm Mortgage Company. Upon the deposit of such check said Boonville National Bank charged the Nixon Farm Mortgage Company's account with the amount of said note and interest and surrendered said note to said Turner, as the agent of said copartnership, or joint adventure.

"That said Boonville National Bank was cognizant of said manner of conducting its business by said copartnership or joint adventure and was thereby induced to honor the checks drawn against said checking account of said Nixon Farm Mortgage Company for the payment of said current expenses of said copartnership, or joint adventure."

The petition then alleges that pursuant to said course of dealing Turner executed to the bank three notes, one of $2000, February 18, 1926, one of $6000, February 23, 1926, and one of $2500, February 26, 1926, aggregating $10,500, all of which was credited to said Nixon Farm Mortgage Company; that thereafter on March 4, 1926, the alleged "copartners or joint adventurers" deposited in said mort-

gage company account two checks, one of $6000 and one of $8500, drawn by Thompson on his account in said Farmers' Trust Company, made payable to said Nixon Farm Mortgage Company; that the bank thereupon charged the mortgage company's account with the amount of said three Turner notes and interest thereon, canceled the notes and surrendered them to the alleged "partnership or joint adventure" and paid out the money on checks drawn on the Nixon Farm Mortgage Company account by said "copartners or joint adventurers;" that on March 8, 1926, Turner, as agent for the alleged "copartnership or joint adventure" executed to the bank another note of $5000, the proceeds of which were likewise deposited to the account of the Nixon Farm Mortgage Company and by the bank paid out on checks drawn by said alleged partners or joint adventurers on account of said copartnership or joint adventure; making in all $19,500 claimed to have been received by the alleged partnership "to the use of the plaintiff bank, which in equity and good conscience said copartners or joint adventurers ought to pay over and deliver to the plaintiffs;" that of said sum plaintiffs have received $4591.90, leaving a balance of $14,908.10, for which, with interest, they ask judgment.

The Evidence.

Plaintiffs' case rests chiefly on the testimony of Mr. Redd, who, at the times involved, was cashier of plaintiff bank. Very soon after the transactions here involved Nixon had fled to Mexico, and when suit was filed he was a fugitive from justice. It appears he had been a defaulter to a large amount in his farm loan business, perhaps other personal business affairs, and had also imposed upon Thompson's confidence in him and had defrauded Thompson in the mining venture. Soon after Nixon's flight Turner was killed. Neither had given testimony by deposition or otherwise. Thompson was dead at the time of trial. If he had given a deposition it is not in evidence.

Plaintiffs' evidence tends to show the following:

About May, 1925, Nixon and Thompson entered into some agreement for the opening and development of certain lead, zinc and barite mines in Camden County, Missouri. Redd testified (over the objections of defendant), that, at a time not fixed, but *after* the transactions here involved, he had heard Thompson state, under oath, in answer to a question as to whether Nixon "was a partner of his in a mining venture in Camden County"—that "he was asked that question if he was a partner and as I remember it, he said he was. Q. Partner with reference to what? A. In this mining venture." In this connection Redd was asked to detail a conversation he had had with Nixon, and (again over defendant's sufficient objections), he answered:

"I can't give you the exact dates. It was along about that time,

June or July (1925), that he told me he and Thompson were operating a mine down at Linn Creek and that Thompson was to furnish the money and he was to look after the mines and anything that would come up in the way of finances up here Emil (E. B.) Turner would look after it.''

He further testified (again over adequate objections), that later Nixon told him ''that Turner would look after it. 'Just call Emil' and he would take care of anything that would come up in the way of finances.''

Nixon and Thompson maintained an office at Linn Creek in Camden County, conducting their mining operations under the name of Nixon-Thompson Mining Company. For brevity we shall refer to this ''company'' as the mining company. There was never an account carried in plaintiff bank in the name of the mining company, nor any record of a loan made to it. Checks for mining company expenditures were drawn by Nixon on the Nixon Farm Mortgage Company account, along with checks on account of Nixon's and Turner's farm loan and other business and personal affairs. Redd testified, ''We took these checks over, had the janitor take them over to Mr. Turner and he would give us a check on the Nixon Farm Mortgage Company to cover these items.'' No record of those checks was kept by the bank and they were not introduced in evidence. Thompson did no banking business with plaintiff bank and neither the bank nor any of its officials or employees ever had any communication with him relative to the checks or financial transactions here involved or to the method of financing the mining operations. The bank dealt altogether with Nixon or Turner, mostly with Turner, evidently relying upon the direction given by Nixon that Turner would look after the financial matters.

Nixon managed the mines, hired employees, etc., and spent most of his time at the mines. Thompson would visit the mines from time to time, sometimes as often as two or three times a week, sometimes once in two or three weeks. On some of these occasions Turner would be present and the three, Nixon, Turner and Thompson, would go over the mines together. In speaking of what was being done and to be done they would use the pronoun ''we.'' There is evidence that Turner sometimes gave orders to employees at the mines in the presence of Thompson. Thompson and Nixon also gave orders to employees. Each of the three at times gave orders as to how the books of the mining company were to be kept. There is no evidence, however, that on any of these occasions there was anything said about the method of financing the enterprise or as to the nature of the arrangement between Nixon and Thompson, except that on one occasion Thompson asked a Mr. Claypool, a mining engineer, ''why he was doing something a certain way,'' and upon being informed that

Nixon had so ordered, Thompson said, ''I will have you to understand I am advancing the money for this venture and I am the head of it and I give you your orders and you will take your orders from me.''

A deed and a lease were introduced in evidence. The deed is a general warranty deed conveying certain lands in Camden County to ''Milton Thompson . . . and Charles W. Nixon. . . .'' That deed simply conveys the lands described to Thompson and Nixon as tenants in common. The lease is what may appropriately be called a mining lease, made to ''C. W. Nixon and Milton Thompson'' as lessees. It leases to the lessees, their heirs or assigns certain lands in Camden County ''for the purpose of digging, drilling, prospecting and mining said land for lead, zinc, coal, asphaltum and every other kind of valuable mineral or ore,'' and contains provisions for the timely commencement and efficient carrying on of mining operations, payment of royalties, etc., by the named lessees, their successors or assigns, such as are usually found in mining leases.

A large number of checks drawn on Thompson's account in the Farmers' Trust Company of Lees Summit were identified by Redd and introduced in evidence. Some of these were signed by Thompson, payable to Nixon. Most of them were signed ''Milton Thompson by C. W. Nixon,'' and of those so signed nearly all were payable to the Nixon Farm Mortgage Company, though in a few instances Nixon drew such checks payable to himself. All or practically all of the checks above mentioned had upon them notations indicating that they were for expenses on account of the mining enterprise. None bore notations or memoranda indicating that they were to be used in paying notes or debts of Turner, Nixon, Nixon Farm Mortgage Company or the mining company to plaintiff bank. Redd testified that all those checks were deposited in the Nixon Farm Mortgage Company account. Nixon's practice of drawing checks on Thompson's account, signed ''Milton Thompson by C. W. Nixon,'' began in June, 1925, and continued until Thompson, in March, 1926, refused to allow his bank to pay the $8500 and $6000 checks above mentioned. Redd testified that during that period a total of $54,055 of checks so signed went through plaintiff bank and were paid. We understand his testimony to mean that the whole amount passed through the Nixon Farm Mortgage Company account. During the same period the total volume of deposits made to that account and checked out of it was $199,589.29.

On December 19, 1925, Turner executed to the bank a note—on its face his personal, individual note—for $1900, the proceeds of which, Redd testified, were credited to the Nixon Farm Mortgage Company account. Between that time and February 18, 1926, the date of the first of the notes mentioned in plaintiffs' petition, he gave several such notes. On February 18th, 23rd, and 26th, 1926, he gave,

respectively, the $2000, $6000 and $2500 notes mentioned in the petition. All of the notes were short time, interest bearing notes. Those note transactions were customarily handled in this wise: The proceeds of the Turner note would be deposited in Turner's personal account in the bank. He would then draw his check to the Nixon Farm Mortgage Company and deposit same in said mortgage company account. When the note matured it would be paid by check on said mortgage company account.

We have mentioned specifically two checks, one for $6000 and one for $8500. Both were drawn by Nixon on the Farmers' Trust Company, of Lees Summit, payable to the order of Nixon Farm Mortgage Company, signed "Milton Thompson by C. W. Nixon." They bear dates, respectively, of February 14 and February 28, 1926. They were deposited in the Nixon Farm Mortgage Company account on March 4, 1926. At that time the Turner $2000, $6000 and $2500 notes were outstanding, and a check was drawn on said mortgage company account to pay those notes and interest. When said $6000 and $8500 checks reached Thompson's bank at Lees Summit payment was refused and the checks were protested, plaintiff bank receiving notice of protest on March 8th. In the meantime Turner had given another $5000 note, the proceeds of which had gone into the mortgage company account and had been mostly checked out. When plaintiff bank received notice of the protest of said two checks it charged back to the Nixon Farm Mortgage Company the amount thereof, leaving said account overdrawn in about that amount, and in addition plaintiff was "out of pocket" the amount of the checks it had paid when Turner gave his last $5000 note. Plaintiff bank then called Turner and took from him a note, signed by him personally and on its face appearing to be his personal and sole obligation, for $19,500, the total amount which the bank claimed was due it. That note was renewed by a similar note, given by Turner, April 28, 1926. The last renewal note was eventually presented by the bank and was allowed as a demand against Turner's estate, on which demand the bank received $4591.90, being the sum which plaintiffs' petition says the bank has received on its original claim against defendant.

As to the notes given by Turner, the proceeds of which were credited to the Nixon Farm Mortgage Company account, Redd was asked on his examination in chief on whose "credit" that was so done and, over defendant's objection that the question called for a conclusion, he answered "Milton Thompson's." On cross-examination regarding this matter he said:

"Q. (by Mr. Bush) These notes introduced in evidence here are not collateral notes? A. No, sir.

"Q. And the checks that you referred to of Milton Thompson, checks signed by Nixon in the nature of drafts on the bank at Lees

Summit, they were postdated, weren't they? A. I don't know whether all of them were or not.

"Q. Anyway, when you made a loan to Turner you didn't attach the check? A. No, sir.

"Q. But, in taking your deposition on December 30, 1930, I asked you if you didn't say that when you would make a loan and take these checks as collateral you kept them in your files? A. No; no, I didn't do that.

"Q. You said, 'he held the checks because we had confidence in him? A. That is it, yes.

"Q. It would have been satisfactory, but as a matter of fact you considered those checks as collateral to the loan, but you let him hold them? A. Yes.

"Q. You were cashier of the bank down there at Boonville at that time? A. Yes, sir.

"Q. You had refused to loan money to a man theretofore because he couldn't furnish collateral? A. Yes, I had.

"Q. You had switched from Nixon, his father-in-law, who had been doing this large amount of business, to the son-in-law, Turner, and took his notes and you took some alleged checks in the nature of drafts as collateral to the notes, didn't you? A. I was depending upon those checks to clear this note.

"Q. I understand what you did. A. Yes.

"Q. But this collateral, to the note, you allowed the man who had made the note to keep? A. Yes.

"Q. Keep the checks? A. Yes.

"Q. As an ordinary, sane banking proposition, when you have collateral to a note in your bank, hasn't it been your custom for years to take a collateral form of note and pin the collateral to it and keep it? A. Yes, that is correct.

"Q. You do that? A. Yes, we do.

"Q. In this particular instance, you allowed Turner to keep his collateral? A. I did.

"Q. And the loan then was made based on these checks as collateral? A. Correct.

"Q. And they were postdated? A. In some instances.

"Q. Well, in the major portion? (No answer.)

"Q. Wasn't that a little unusual? A. Indeed it was, but it was on account of the confidence I had in Turner that I did it, because all the rest of the checks had been paid and I didn't anticipate any trouble.

"Q. At the time you started there weren't very many loans had been made when you first started to loan with Turner, had there? A. At that time?

"Q. The first loan, I say there hadn't any other loans been made on that basis? (No answer.)

"Q. (by Mr. Bush) So, you made him a loan and looked to the future for him to get a check from Thompson to pay it? A. Correct.

"Q. And credited the money to his account? A. Yes.

"Q. That was a little unusual? A. Yes.

'Q. It was also unusual you never called Thompson? A. No, I never called Thompson.

"Q. Never wrote him a letter? A. No.

"Q. Never asked him to guarantee these notes? A. I did not.

"Q. You didn't ask him whether he would pay the checks or not, when they came due? A. I didn't talk to Mr. Thompson."

■ Plaintiffs' case rests essentially upon the proposition that there existed between Nixon and Thompson a partnership such that Nixon, one of the alleged partners, could borrow money and bind the partnership, and, having such authority, could appoint Turner as agent for the partnership and authorize him to borrow money for the firm, without consulting Thompson, the alleged copartner. There is no evidence tending to prove that Turner was a member of the alleged partnership. Plaintiffs' petition does not proceed upon that theory. It alleges that he was the agent of the partnership. If so, he got his authority as such agent from Nixon. There is no evidence that Thompson ever authorized him to act or knew he was purporting or attempting to act for the alleged partnership in the matter of procuring money to finance the mining venture. It may be inferred that Thompson knew that Nixon was paying mining expenses through the Nixon Farm Mortgage Company, since checks drawn by Nixon on Thompson's account, signed "Milton Thompson by C. W. Nixon," were sometimes made payable to Nixon Farm Mortgage Company, were paid, and presumably were returned to and seen by Thompson before the $6000 and $8500 checks were given. But under the facts shown we do not think this would authorize a finding that he knew or even that he should have known or understood that Nixon was borrowing money for partnership purposes. The arrangement for financing the mining venture was to the effect that he was to furnish the money, which he was amply able to do and did do promptly when called upon, until, at the last, when the last two above-mentioned checks were drawn on him by Nixon, he had, with reason, become suspicious that Nixon was diverting and misappropriating the money; and at that time the loans here in question had already been made.

We think the evidence insufficient to authorize a finding that there existed between Nixon and Thompson a partnership, such as would empower Nixon to borrow money, or authorize Turner to borrow it, without Thompson's knowledge or consent, on the latter's credit, or on behalf of the alleged partnership, so as to make Thompson liable as a member of such alleged partnership. Indeed, there

is no evidence that Turner ever told the bank that he was borrowing for the mining company—the alleged partnership—and Redd, cashier of the bank, did not testify that he understood he was loaning to the partnership or to Turner for the partnership. He said, on direct examination, that he made the loans to Turner on *Thompson's* credit and on cross-examination explained that statement by saying that he considered and treated Thompson's checks as collateral for the loans, allowing Turner to hold the collateral because of his confidence in Turner. The bank knew that the money it loaned Turner was by him transferred to the Nixon Farm Mortgage Company account, and while it knew that checks for mining company expenses were being paid out of that account it also knew that said account was drawn upon by Nixon and Turner and their families for purposes not connected with the mining company business. By far the larger part of the volume of deposits in and withdrawals from that account were for such other purposes. It cannot be assumed, therefore, that Turner was borrowing only for the use of the mining company. Nor can it be determined from the record just what portion of the money thus borrowed by Turner actually went to payment of mining company expenses.

But if it were conceded that there is enough in the evidence to warrant an inference that Turner borrowed the money for the use of the mining company, his only authority so to do, as we have said, came from Nixon and Nixon, we think, could confer no such authority. The evidence sufficiently shows that there was an arrangement or agreement between Nixon and Thompson for the purpose of prospecting and mining certain mineral lands. But nothing is shown as to the character or terms of that agreement except that Thompson was to furnish the money and Nixon was to supervise and manage the mines. The fact that Thompson was to furnish the money, it seems to us, tends to negative the idea that Nixon was authorized to borrow money for the purposes of the alleged "joint adventure," rather than to imply that he had such authority. Moreover, under the facts shown in evidence it cannot be said that the money here in question was borrowed by Turner solely for the use of the mining company or loaned by the bank to the mining company or to Turner for it.

In Hely v. Hinerman, 303 Mo. 147, l. c. 172, 260 S. W. 471, it is said:

"Counsel for appellant first insist that the circuit court erred in refusing to permit in evidence that statements of Hinerman and Cope to the effect that defendant Smith was a partner in the copartnership of Hinerman Construction Company. There is no merit in this contention. Clearly all such statements are merely statements of legal conclusions. A copartnership can be created only by contract made and entered into by the parties, and in order to prove its existence

the terms of the agreement must be proven, and the fact of its existence must be drawn from the terms proven, and not the terms of the contract from the mere statement of the fact, or legal conclusions." (Citing cases.)

In Wittling v. Schreiber (Mo. App.), 202 S. W. 418, 420, we read: "A mere agreement to divide the profits of the business . . . is not sufficient to constitute a partnership even in the conduct of a business. (Citing cases.) As is said in these cases, a mere statement that a certain business was a partnership business or that the parties were partners, is a mere legal conclusion and is of no probative force in establishing the fact of partnership."

The evidence, we think, falls short of proving a commercial or trading partnership. It tends at most to show a nontrading partnership, in which, as said in 47 Corpus Juris, 828, section 291, "the doctrine of general agency and implied liability does not apply, and a partner does not generally possess power to act for and bind the firm and other partners unless such power is specifically conferred; or unless it arises by implication from the usages of the business in which the firm is engaged, or from the course of dealing of the particular partnership, in which case the nature of the business, and what is usual and customary therein, will be the measure of each partner's authority."

In American Bonding Co. v. Fults, 157 Mo. App. 553, 556, 138 S. W. 689, the court says it is "the well-known rule that the partners of a nontrading firm have no implied power to bind each other, and a creditor seeking to hold one of the partners on commercial paper issued in the firm name must show previous authorization or subsequent ratification of the act by the partner sought to be charged." In the instant case we find neither previous authorization nor subsequent ratification. For other cases recognizing in principle said rule see the following: Deardorf v. Thacher, 78 Mo. 128; Randall v. Lee & Randall, 68 Mo. App. 561; Third Nat. Bank v. Faults & Co., 115 Mo. App. 42, 90 S. W. 755; Shaw v. Gunby, 188 Mo. App. 659, 176 S. W. 548; Powell Hdw. Co. v. Mayer, 110 Mo. App. 14, 83 S. W. 1008 (money had and received).

Appellant contends here that the partnership as alleged in the petition is admitted by the pleadings under Section 965, Revised Statutes 1929 (Mo. Stat. Ann., sec. 965, p. 1235), because the defendant's answer, denying its existence, was not verified. It may be questioned whether or not the petition alleges the existence of a commercial or trading partnership. But assuming, without deciding, that it does, we think said statute inapplicable. It provides that "where plaintiffs or defendants sue or are sued as a partnership, . . . it shall not be necessary to prove the fact of such . . . partnership, unless the opposite party put such fact in issue by affidavit filed with the pleadings in the cause." In Short v. Taylor,

137 Mo. 517, 38 S. W. 952, an action for an account between alleged partners, the defendant's answer denying the existence of a partnership relation was not verified. The statute was invoked. The court said, 137 Mo. 1. c. 525, 38 S. W. 952:

"That section dispenses with proof of certain allegations of partnership in actions by, or against alleged partners, unless the denial thereof is sworn to. But the terms of the statute do not reach the case of a suit by one individual against another, charging a partnership relation between them. Such a state of facts is not within the letter of the statute, nor do we regard it as within its spirit or intent." [See, also, Sain v. Rooney, 125 Mo. App. 176, 101 S. W. 1127; Drumm Flato Comm. Co. v. Summers, 89 Mo. App. 300.]

In the instant case the suit is not against an alleged partnership. Thompson was sued individually and his executrix, who filed the answer herein, is now the sole defendant. As said in Short v. Taylor, supra, "such a state of facts is not within the letter of the statute nor do we regard it as within its spirit or intent."

Respondent asserts several other grounds upon which it is contended the trial courts' ruling which forced the nonsuit herein should be sustained. In view of our conclusion as to the lack of authority of Nixon or Turner to create the liability against Thompson now sought to be enforced we deem it unnecessary to discuss such other grounds. The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.