**C. G. GALES, Appellant,**

v.

**D. F. WELDON and K. L. Peters,**
**Respondents.**

No. 44464.

Supreme Court of Missouri.

Division No. 1.

Sept. 12, 1955.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 10, 1955.

C. A. Powell,. Dexter, for appellant.

Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., Limbaugh & Limbaugh, Cape Girardeau, for respondents.

HOLMAN, Commissioner.

Plaintiff C. G. Gales (appellant), by this action, seeks to rescind a purchase by him from defendants (respondents) D. F. Weldon and K. L. Peters, of a one-sixteenth fractional undivided working interest in an oil lease covering six acres of land located in Caddo Parish, Louisiana. He paid $5,200 for this interest. Recovery herein is sought for the amount paid plus interest, attorney fees, and punitive damages in the sum of $10,000. Plaintiff contends that the sale was a violation of "The Missouri Securities Law" (often referred to as the "Blue Sky Law"), Sections 409.010 to 409.320, inclusive (unless otherwise indicated all statutory references are to RSMo 1949, V.A.M.S.), it being admitted that the various interests in the lease assigned to plaintiff and others were not registered with the commissioner or supervisor of corporation registration of the State of Missouri. At the close of all the evidence the trial court directed a verdict for defendants. From the ensuing judgment the plaintiff has duly appealed.

The lease involved in this action was obtained in 1951 by one L. A. Norris of Shreveport, Louisiana, a dealer in oil leases. Many producing oil wells were located in the area surrounding the land covered by the lease. The owners reserved a one-eighth royalty. Norris, in consideration of $500 and the reservation of a "one-sixteenth override," assigned the lease to defendant Peters. The assignment to Peters conveyed what is known as "working interests." It appears that the owners of "working interests" must pay for the drilling, equipping, and developing of the well while those retaining a "royalty" or an "override" are not required to contribute to those expenses.

Defendant Weldon lived in Cape Girardeau, Missouri, and was experienced in drilling wells for water and had drilled some shallow oil wells in Illinois. Peters lived in Jonesboro, Arkansas, and had engaged in oil field activities for many years, although during the period in question he was also employed as a bus driver. He and Weldon had been acquainted for several years. In December 1952 or January 1953, these defendants entered into an oral agreement concerning the drilling of one or more wells upon the leased land. It was known that there were two kinds of sand formation in this area in which oil is found—the Nacitosh at about 900 feet and the Woodbine (producing a better quality oil) at 2200 feet. The defendants estimated that it would require $14,000 to drill and equip a well to the Woodbine formation. The agreement of the defendants did not contemplate that either of them would furnish any of the required capital. It was the obligation of Weldon to sell working interests covering one half of the interest acquired by Peters from Norris for a sufficient sum to cover the cost of the well. Peters agreed to execute assignments to the prospective purchasers and to supervise the drilling of the well and the production of the oil therefrom. The defendants were to divide the remaining one-half interest held by Peters.

Defendant Weldon first talked to Harry Faig of Elk Creek, Missouri, and sought to induce him to furnish the $14,000. He stated he was not able to do so but indicated that he might invest half that amount.

Both defendants then contacted Harold Doxtater of Poplar Bluff, Missouri, who purchased a one-eighth interest in the lease for $3,500. They again contacted Faig and took him to see the land. Upon the return trip they stopped at the Peters home in Jonesboro and Faig then decided to purchase a one-fourth interest for $7,000 and gave them a check for that amount.

On January 26, 1953, defendants started drilling the well and it was completed and capped in five or six days. During the period required for drilling and equipping the well, Mr. Faig spent about two weeks at or near the well site observing the operations.

Weldon called on plaintiff at Dexter, Missouri, on February 2, 1953, and attempted to sell him a one-sixteenth interest in the lease for $5,200. Plaintiff stated he was not interested, but later agreed to go with Weldon to look at the well. They made the trip and arrived back home on the morning of February 4, and later that day plaintiff agreed to buy the interest at the price quoted. The money was paid by delivery of a number of checks during the next two days and Weldon gave plaintiff a receipt for the $5,200. Shortly thereafter plaintiff received a certified copy of an assignment of the interest from defendant Peters, it being required that the original be retained in the office of the recorder of Caddo Parish.

Shortly after the sale to plaintiff, defendants sold a one-sixteenth interest to Robert Beffa of St. Louis for $6,000. He was taken to the well site by Weldon and while there agreed to buy the interest and paid Weldon $1,000. The remaining $5,000 was delivered to Weldon when they returned to St. Louis. Early in March, 1953, Peters sold another one-sixteenth interest to Faig for $1,177.30. This sale was arranged over long-distance telephone and the assignment delivered through a bank in St. Louis.

Weldon, during this period, also called upon and attempted to sell various interests in the lease to Carl J. Ringer at Dex-

ter, Missouri, R. Kip Briney at Bloomfield, Missouri, Guy Shackleford at Poplar Bluff, Missouri, and Ivan DeJarnett at Dexter. He also attempted to sell Clinton Shell of Dexter an interest in a lease he proposed to obtain on an adjoining tract of land. In attempting these sales this defendant took with him a bottle of the oil and a sample of the core taken from the well, which he displayed to his prospects. Up to the time of trial, defendants had collected more than $23,000 from their sales, and the cost of drilling the well and equipment therefor was over $17,000. Weldon still had on hand about $4,000 and Peters had the $1,177 collected from the last sale to Faig.

The well was not a success. While it did produce oil, the volume is only about two and one-half barrels a day, and after paying expenses this leaves the investors a very small return on their investment.

Plaintiff wrote the supervisor of corporation registration of Missouri and, upon learning that the assignments or alleged securities were not registered, demanded that defendants return his money. Upon filing this suit he attached to the petition an assignment and a quitclaim deed which he tendered to defendants, each of which purported to reconvey his interest in the lease to Peters.

It is provided in Section 409.030 that "No securities * * * (except those exempt under Sections 409.040 or 409.050) shall be sold within this state unless such securities shall have been registered by notification or by qualification as herein defined." The definition of "securities" in Section 409.-020(3) includes any "fractional undivided interest in oil, gas, or other mineral rights; * * * any certificate, contract, receipt or instrument whatsoever representing or constituting evidence of, or secured by, title to or interest in any oil, gas or mining lease * * *." Plaintiff bases his right to recover in this action upon the provisions of Section 409.240 which are, in part, as follows: "Every sale or contract for sale made in violation of any of the provisions of this chapter shall be voidable at the election of

the purchaser and the person making such sale or contract for sale and every director, officer or agent of or for such seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser in an action at law in any court of competent jurisdiction upon tender to the seller in person or in open court of the securities sold or of the contract made for the full amount paid by such purchaser, together with all taxable court costs and reasonable attorney's fees in any action or tender under this section; * * *."

■ It appears clear that the fractional interest in the lease purchased by plaintiff from the defendants is a "security" under the plain definition in the statute and therefore, unless exempted by other provisions of Chapter 409, it could not be legally sold in Missouri without registration as provided in said chapter. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; Commonwealth v. Yaste, 166 Pa.Super. 275, 70 A.2d 685; Paine v. Smith, 114 Cal. App.2d 767, 251 P.2d 18.

No contention is made that this transaction was exempt under the provisions of Section 409.040. However, defendants do argue that this was an isolated transaction and was exempt from the provisions of Chapter 409 by reason of the exemption specified in Section 409.050, as follows: "Except as herein provided, the provisions of this chapter shall not apply to the sale of any securities in any of the following transactions: * * * (3) In an isolated transaction in which any security is sold, offered for sale, or delivery by the owner thereof, or by his representative for the owner's account such sale or offer for sale, or delivery not being made in the course of repeated and successive transactions of a like character by such owner, or on his account by such representative, and such owner or representative not being the issuer or a promoter of such security; * .* *."

The word "isolated" is in common usage and has a well-defined meaning. It is uni-

versally understood to mean "placed or standing alone; detached; separated; solitary." Webster's New International Dictionary (Second Edition). It is the antonym of "repeated" or "successive." In Kneeland v. Emerton, 280 Mass. 371, 183 N.E. 155, 163, 87 A.L.R. 1, the court construed an almost identical provision, saying, "The words 'repeated and successive' are used by way of contrast to the word 'isolated' employed earlier in the same sentence. In such context an 'isolated' sale means one standing alone, disconnected from any other, and 'repeated and successive' mean transactions undertaken and performed one after the other. We think that two sales of securities, made one after the other within a period of such reasonable time as to indicate that one general purpose actuates the vendor and that the sales promote the same aim and are not so detached and separated as to form no part of a single plan, would be 'repeated and successive transactions.' "

In the instant case the defendants, over a period of two months, admittedly made five separate sales (including the one to plaintiff) of fractional interests in the lease and offered similar interests for sale to at least four other Missouri residents. It is admitted that all of these sales and attempts to sell were a part of the same general purpose and plan, i. e., to obtain the money required to drill and equip a well on the leased land. Defendants, however, argue that the "transaction" was the "enterprise which had as its purpose the drilling of a well" and since there was but one enterprise it was an isolated transaction. We can find no logical basis for this interpretation. The case cited by defendants (Commonwealth v. Summons, 157 Pa.Super. 95, 41 A.2d 697) does not support this contention. The statute seeks to prohibit the sale of unregistered securities including a "fractional undivided interest in oil * * * rights." We find nothing in the section prohibiting such sales, or in the section relating to the claimed exemption, to indicate that the transaction must involve more than one lease or the drilling of multiple wells. Moreover, it should be noted that the amount paid by

Beffa for his interest included $800 for his share of the cost of drilling another well on the leased premises.

■ Under the admitted facts of this case we rule as a matter of law that the sale to plaintiff was not an "isolated transaction" which was exempt under the provision heretofore quoted. In view of this conclusion we need not determine whether either or both of the defendants were "issuers" or "promoters" of the instant security as such terms are used in the statute under consideration.

Defendants next assert that the Securities Law has no application to this sale because the parties to this transaction were engaged in a "joint adventure" or "partnership." They cite numerous cases, including Grabendike v. Adix, 335 Mich. 128, 55 N.W.2d 761; Lindemulder v. Shoup, 258 Mich. 679, 242 N.W. 807; Hanneman v. Gratz, 170 Minn. 38, 211 N.W. 961; Hathaway v. Porter Royalty Pool, Inc., 296 Mich. 90, 295 N.W. 571, 138 A.L.R. 955; Young v. Reed, La.App., 192 So. 780. Some of these cases hold that the so-called Blue Sky Laws do not apply to investments in or contributions to a joint adventure. However, we think all of these cases may be distinguished from the instant case either upon the facts or the applicable statute.

■ A "joint adventure" is founded entirely on contract, either express or implied. It can exist only by the voluntary agreement of the parties to it. It has been defined as "an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." 48 C.J.S., Joint Adventures, § 1a. It is in the nature of a partnership, generally governed by the same rules of law, the principal difference being that a joint adventure is usually limited to a single transaction. As a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in such losses as may be sustained. 48 C.J.S., Joint Adventures, § 2a.

■ We have concluded that under the facts of this case plaintiff was not a party to a joint adventure or partnership and hence we need not determine whether "The Missouri Securities Law" would apply to investments in such a relationship. Boonville National Bank v. Thompson, 339 Mo. 1049, 99 S.W.2d 93; Darling v. Buddy, 318 Mo. 784, 1 S.W.2d 163, 58 A.L.R. 493; Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562.

Defendant Peters owned the lease and desired to obtain money to drill and equip a well on the land covered by it. He therefore agreed to give Weldon a one-fourth working interest in the lease if he would sell not more than one half of the working interests for an amount sufficient to accomplish the desired purpose. This may have created a type of partnership between Peters and Weldon. However, none of the subsequent purchasers of undivided interests agreed to do anything except participate in the profits. They did not agree to pay any losses or make further contributions. It does not appear that they had any control over the project. They were not consulted about who would be brought into the enterprise by the sale of other fractional interests. Actually, there does not appear to have been any concerted effort or agreement between the owners of the various interests. It is also significant that there was no uniformity in the amount paid or contributed for the various interests. Computed on the basis of a one-sixteenth interest, plaintiff paid $5,200, Doxtater $1,750, Faig $1,750 and later $1,177, and Beffa $6,000. There was also no agreement that any part of the amount paid would be returned if all of it was not needed to drill and equip the well. We have made these various observations to indicate that the transactions in question were sales and not contributions to a joint adventure.

Defendants next contend that plaintiff is not entitled to recover because if they have violated the "Blue Sky Law," plaintiff is

in pari delicto with them. This is based upon the evidence that shortly after his purchase of the interest plaintiff made a trip to the well site to inspect the progress of the work and later, upon learning that more money was needed to complete the project, he (according to the testimony of Weldon) suggested to Weldon the names of three friends whom he thought might buy an interest and introduced Weldon to two of them. It has been held that a purchaser who joins with the sellers and actively participates with them in the enterprise over a long period is estopped from recovery in a suit of this nature. Schrier v. B. & B. Oil Co., 311 Mich. 118, 18 N.W.2d 392.

■■ As we have indicated, defendants do not contend that plaintiff is in pari delicto because of the fact that he purchased an unregistered security. In view of the fact that they rely upon his acts and conduct thereafter, we think the alleged defense would be more accurately designated as an estoppel. Such a defense is required to be pleaded. Section 509.090. In the instant case estoppel was not pleaded by either defendant. Furthermore, the slight participation of plaintiff was limited to a period of about 10 days following his purchase, during which time he had no knowledge that defendants had not registered the securities. As soon as he learned that there had been no compliance with the Securities Act he sought to rescind the transaction. In this connection, see Schmidt v. Stortz, 208 Mo.App. 439, 236 S.W. 694; Landwehr v. Lingenfelder, Mo.App., 249 S.W. 723. We rule this point against defendants.

It is the further contention of the defendants that the Missouri Act does not apply to this transaction because it was completed in Louisiana. They argue that defendant Peters recorded the assignment in Louisiana and that this constituted a delivery of the instrument in that state. They reason further that since delivery was the last act necessary for the completion of the transaction, the matter is subject to the laws of Louisiana and not of Missouri.

v ■ It is elementary that "The Missouri Securities Law" would have no extraterritorial effect. However, we are convinced that the sale in the instant case was a Missouri transaction governed by the laws of this state. Plaintiff resides in Missouri; he was first contacted at his home in Dexter; the agreement with Weldon to buy the interest was made at plaintiff's home; the purchase price was paid in this state; Weldon executed a receipt and delivered it to plaintiff at his home and, finally, the certified copy of the assignment (the original being required to be retained in the recorder's office) was delivered to plaintiff in Missouri. Under the facts of this case, the act of Peters in recording the assignment before delivery to plaintiff would have no effect upon the legal question involved. It was merely an accommodation to plaintiff.

■ It is also suggested by defendants that since the assignment of the interest in the lease is the transfer of an interest in real estate it could not be considered the sale of a security. This contention is best answered by the specific definition of a "security" in the statute which clearly includes such an interest. Many cases have also held that leases and assignments are within the scope of acts of this nature. Securities and Exchange Commission v. C. M. Joiner Leasing Corp., supra; Commonwealth v. Yaste, supra. We accordingly rule this point against defendants.

Plaintiff, in his petition, in addition to allegations stating a cause of action under Chapter 409, alleged that he was induced to purchase the interest in the lease by reason of false and fraudulent representations made by Weldon while acting for himself and as agent for defendant Peters. This alleged fraud was made the basis of his prayer for $10,000 punitive damages.

■ Defendants contend that plaintiff cannot, in any event, recover punitive damages in this action because there is no provision for such in the statute. With this we agree. If plaintiff had so desired he could have brought an action for damages

for fraud and upon a proper showing could have recovered punitive as well as his actual damages. Menke v. Rovin, 352 Mo. 826, 180 S.W.2d 24. He elected, however, to pursue the remedy provided in Section 409.240. This and other sections of Chapter 409 created a new cause of action which did not exist at common law and prescribed the manner of enforcing the remedy and the extent of the recovery. "Where a code or statute creates a new right or liability that did not exist at common law or under prior statutes, and also provides a specific remedy for the enforcement thereof, as a general rule such statutory remedy is exclusive * * *. In such a case the prescribed statutory remedy operates as a negation of, and impliedly excludes, any other remedy, such as a common-law remedy; and the whole matter of right and remedy is within the statute, and no part of either otherwise exists." 1 C.J.S., Actions, § 6b. See also Osagera v. Schaff, 293 Mo. 333, 240 S.W. 124; Mennemeyer v. Hart, 359 Mo. 423, 221 S.W.2d 960. We think the provisions of Section 409.240 are preclusive and hence it follows that since no provision is made therein for the recovery of punitive damages, plaintiff could in no event recover such.

What we have heretofore said will indicate our view that the trial court erred in directing a verdict for the defendants. We have concluded that under the pleadings and evidence a verdict should have been directed for plaintiff for the amount paid defendants, and interest, and that the jury should have been permitted to determine the amount of the allowance to plaintiff for a reasonable attorney fee.

The cause is accordingly reversed and remanded with directions to the trial court to set aside the verdict and judgment for defendants and, in accordance with his after-trial motion, to enter a judgment for plaintiff in the sum of $5,200 with interest thereon from February 7, 1953, to be computed in accordance with the provisions of Section 409.240. A new trial is ordered on the issue of the amount of plaintiff's recovery for a reasonable attorney fee in this action.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.