Ida Boyd, Appellant, v. Logan Jones Dry Goods Company, a Corporation.—104 S. W. (2d) 348.

Division One, April 21, 1937.

*Barnett & Coolidge* and *Thomas & Flora* for appellant.

*Harris & Koontz* for respondent.

HYDE, C.—This is an action for damages for the death of plaintiff's husband alleged to have been caused by defendant's negligence. The court sustained a demurrer to plaintiff's evidence and plaintiff, after taking an involuntary nonsuit and unsuccessfully moving to set it aside, has appealed from the final judgment of dismissal. A previous trial was also ended by a nonsuit.

A premature appeal heretofore taken by plaintiff was dismissed. [Boyd v. Logan Jones Dry Goods Co., 335 Mo. 947, 74 S. W. (2d) 598.] It is now contended that the case ended with the term at which the motion to set aside the nonsuit was overruled, and ordinarily it would be. [Stith v. Newberry Co., 336 Mo. 467, 79 S. W. (2d) 447.] This is because under Section 3266, Revised Statutes 1929, a plaintiff in a wrongful death case has the right to commence a new action within one year after nonsuit. [See, also, Sec. 874 and Sec. 960, R. S. 1929.] However, the record here shows that the court at that term (which was the trial term) ordered a judgment of nonsuit entered, but that none was in fact entered. Plaintiff had the right of appeal from a final judgment of dismissal, and could not do so until one was entered. The court's order, not being acted on, went over to the next term, so that the judgment ordered could thereafter be entered. Otherwise, plaintiff's right to appeal would be defeated by refusal or failure to obey the court's order to enter the final judgment at the proper time. Under these circumstances, since there was no judgment entered at the trial term from which plaintiff could appeal, we hold that the court did have authority at a subsequent term to enforce its order and have entered a final judgment of dismissal from which plaintiff could then appeal. [See Arcadia Tim-

ber Co. v. Evans, 304 Mo. 674, 264 S. W. 810; Boyd v. Logan Jones Dry Goods Co., 335 Mo. 947, 74 S. W. (2d) 598; Magee v. Mercantile-Commerce Bank & Trust Co., 339 Mo. 559, 98 S. W. (2d) 614.] It is further contended that the nonsuit taken was voluntary, but the cases upon which defendant relies have been overruled. [See Boonville National Bank v. Thompson, 339 Mo. 1049, 99 S. W. (2d) 93; Arp v. Rogers (Mo.), 99 S. W. (2d) 103.]

The demurrer was sustained at the close of plaintiff's case so the only evidence is that offered by plaintiff. This evidence, considered most favorably to plaintiff's contentions, tended to show the facts hereinafter stated. Mr. Boyd, seventy-six years old, died from shock affecting his heart after a fall in defendant's store which broke his hip. According to medical testimony, he was senile, had hardening of the arteries, and a heart inflammation. About four years before his death he had fallen in the street while trying to catch a street car and fractured his kneecap. He had recovered from this so that he walked without a cane or crutch and had been operating a small grocery store. He was able to and did go up and down steps in delivering groceries in the neighborhood of his store.

Plaintiff fell on the landing between the first and second floors of defendant's store. On each side of this landing, a mezzanine floor or balcony extended north and south on a level about seven inches above it. This balcony, except for part left open for customers' passageway to the second floor, was used for offices. There was a wide stairway from the first floor to this landing, located in the front central part of the balcony. It had handrails on each side and also a handrail in the center. On reaching this landing, one could continue his ascent to the second floor by turning, either to his left (south), or to his right (north). After making a quarter (right angle) turn either to the left or the right, one would then ascend the additional height of about seven inches to the level of the balcony floor. He would then make another quarter (right angle) turn to his right (if he took the north or righthand way from the landing), or otherwise to his left, and ascend one of the two flanking stairways leading in an easterly direction from the balcony floor to the second floor. One making the first quarter turn to the left would make the first ascent of about seven inches from the landing to the balcony floor on an inclined part of the floor called a gradient. One turning to the right would make that ascent by a step. Thus the landing also served as the central part of the balcony floor but was depressed below the level of that floor on each side, and in the wall at the back of the landing there was a cashier's window. The step on the north side of the landing did not run due east and west, but ran diagonally from the newel post of the stairway on the east (front) side to the wall on the west (back) side of the balcony. The distance north and south

across the east (front) side of the landing along the top of the stairway, from the beginning of the gradient or inclined part of the floor on the south end to the diagonal step on the north end of the landing, was therefore approximately three feet more than across its west (rear) side along the wall. The landing floor was about six feet across (east to west), from the top of the first floor stairway to the east wall. This diagonal step likewise made the balcony floor, in front of the north flight of stairs to the second floor, extend three feet farther south on its west (back) side than on its east (front) side. The width of the so-called diagonal step, which was actually a part of the balcony floor, was five feet across measuring only the part beginning at the north end of the bottom step of the north second floor stairway. At the back of the balcony, the diagonal step was a little more than eight feet in width. There was another window at the back of the part of the balcony, which is referred to as the diagonal step, called the credit window. The widest part of the diagonal step (or diagonal part of the balcony floor) ended at the point where it came to the wall about midway between the credit window and the cashier's window. There were two 200 watt electric lights over the landing and this diagonal part of the balcony. The lower half of each light globe was "frosted."

The only evidence as to the actual occurrence of Mr. Boyd's fall was the testimony of Mr. Yocum, an employee of defendant at the time. He said:

"I remember John W. Boyd being in an accident there on that landing on the 18th of August, 1926. . . . I was coming up the stairs from the first floor to this landing. At the landing I turned to the right, to the north. . .. . I just remembered there was somebody in my way there, and I just stopped for a second while the party, whoever it was, went from in front of me and I just stepped on. . . . He passed . . . on my left (in front of this second story flight of steps). .. . . I probably had gone two or three or four steps, possibly, when I heard a noise, something like a fall, and I saw this gentleman lying against the partition. . . . He was down with his hip against this partition. . . . His body may have been partially on the upper level. . . . We found him right there under the cashier's window. That would be down the step after he made the step, if he made it."

On direct examination Yocum also testified:

"Q. When you went to him, did you have any conversation with him? A. Yes, sir. I just said, 'How did it happen?' Q. What did he say? A. He stepped off and his knees went from under him."

On cross-examination he testified:

"Q. Let me ask you if you didn't make this answer to this question when the case was tried some two and a half years ago (reading):

'Q. Can you give the exact language, as near as you can give it? A. As near as I can give it, I just asked him how he happened to fall and he said, when he stepped down, "I have a bad knee, and when I stepped down, my knee gave way on me." Didn't you make that answer at the time the case was tried before? A. If that is the court's records, I evidently made it. . . .' Q. And was that true? A. To the best of my knowledge, possibly, at that time." (He said that before the last trial he had refreshed his memory from his testimony at the coronor's inquest.) Yocum also said that he had seen Mr. Boyd in defendant's store at other times.

Plaintiff's contentions are set out in the brief as follows:

"Defendant was guilty of negligence in maintaining this diagonal step at this place, for the following reasons:

"(1) Because it was contrary to the city ordinance requiring 'a proper landing,' which means a rectangular landing with right angle corners.

"(2) Because it was contrary to the city ordinance requiring that the steps be of uniform width.

"(3) Because, regardless of any ordinance, good practice among architects and building engineers requires that the lines of landings in stairways be at right angles with the line of travel.

"(4) Because, even in the absence of evidence of any ordinance or of any good building practice, a diagonal step in a stairway or stairway landing, or between two landings, is dangerous, as a matter of common knowledge.

"(5) Because of the other conditions there existing, such as the absence of any step across the way, where a rise in elevation was provided for by a gradient and because such gradient was likely to deceive one traveling in the direction taken by deceased, into thinking that the landing and the mezzanine floor were all one level.

"(6) Because the stairs were equipped with handrails, while at the place of this diagonal step there were no handrails provided.

"(7) Because an intense light was so placed as to blind one just before he reached the step in question."

The city ordinance invoked applies to flights of stairs and landings in stairways which are required where the height exceeds eleven feet. The diagonal step complained of was neither in the landing nor the stairway but was in the balcony floor. The ordinance does not prohibit a single step from a landing to a balcony floor or any other floor; neither does it require handrails at such a place. All that the ordinance requires anyhow is "a proper landing" which must be construed as requiring a reasonably safe landing since no standards or specifications are stated. We would therefore have to decide the same question whether the ordinance applied or not.

The St. Louis Court of Appeals decided diagonal step case, Stein

v. Buckingham Realty Co. (Mo. App.), 60 S. W. (2d) 712, ruling against liability on the ground of negligent construction. (It remanded the case to be tried on the theory of insufficient lighting.) The court said:

"We cannot shut our eyes to the fact, which every one knows, that stairways in hotels and public buildings, especially of the older types, are frequently made of marble; that, where the stairways turn, the stairs themselves are necessarily of *fan-shaped construction;* and that stairways so constructed, though they are undoubtedly of a character to require more care in their use than do wooden or carpeted stairways, are yet not inherently dangerous, but have been found proper to answer the purpose for which they are designed in the general use to which they have been put throughout the length and breadth of the land. Under such circumstances no jury may be permitted to denominate the mere maintenance of a marble stairway as an act of negligence upon which to base a liability for damages to one falling upon it with knowledge of its construction."

Plaintiff complains of not being allowed to show that other people had fallen at this place. If the step was not reasonably safe such evidence would tend to show knowledge of the condition but it does not prove negligent construction, because people can and do fall on properly constructed steps. The question here is: Does the mere fact that steps are not built on lines exactly at right angles, to the main direction of travel, prove negligence? The architects' testimony, like the ordinance referred to, concerns landings in stairways; and even if architects do consider it better building practice to have all steps placed at right angles to the main line of travel, the question here would still be whether or not this arrangement of the balcony floor was reasonably safe. Such a building practice does not demonstrate that all other construction is unsafe. The law's requirement is reasonable safety, not perfection, or even the safest that human ingenuity can devise. We frequently see circular steps in public buildings. Curves are considered more beautiful than straight lines. It would surely have cramped the style of such architects as Brunelleschi, Michelangelo, Leonardo Da Vinci, and Sir Christopher Wren to have been limited to straight lines. Even sidewalks in city streets have rounded corners at street intersections. We do not think there is any precedent for saying that straight lines are essential to reasonable safety, at least where the situation is apparent to anyone who will look. To impose liability here, there must be substantial evidence to show either that the arrangement of the balcony floor was inherently dangerous, or that the condition was for some reason (insufficient light, concealment, obstruction, etc.) not clearly obvious. [Paubel v. *Hitz,* 339 Mo. 274, 96 S. W. (2d) 369; Peck v. Yale Amusement Co. (Mo.), 195 S. W. 1033; Main v. Lehman, 294 Mo. 579, 243 S. W. 91; Oakley

v. Richards, 275 Mo. 266, 204 S. W. 505; Mullen v. Sensenbrenner Mercantile Company (Mo.), 260 S. W. 982; Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278; Ilgenfritz v. Missouri Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723.]

We cannot view this evidence as sufficient to make a case for the jury on negligent construction. This is not a case of a step too narrow for a foothold. There was five feet to walk on at the narrow end and eight feet at the wide end. Mr. Boyd fell at the widest part. Pictures in evidence show the condition here was apparent and obvious to anyone who looked. It is difficult to understand how Mr. Boyd could have been deceived by any appearances because he met Mr. Yocum on the step. If he was looking where he was going, he could not have failed to see Mr. Yocum step up the step from the landing to the balcony floor when he did so while directly in front of him. The place was well lighted. In fact plaintiff's complaint is too strong light. Plaintiff says: "It is common knowledge, as well as scientific fact, that as age comes on, the pupil of the eye much more slowly adjusts itself to variations in light, and this man of·seventy-six years of age, may easily, without any fault of his own, have been so affected by the glare of the electric light at the foot of the stairway as to have thought, in view of other conditions thereabout, that he saw an even surface ahead of him, notwithstanding the actual presence of the diagonal step." This is so purely speculative, in view of the conceded fact that the lower half of the light globes were frosted, that we must hold that no negligence in lighting was shown. We further hold that showing there was a diagonal step, because the balcony was three feet farther south at one end than at the other, was not sufficient evidence of negligent construction to go to the jury, when it was also shown that its narrowest part was wide enough for a secure foothold; that it as lighted well enough for the whole situation to be clearly seen; and that anyone exercising ordinary care could walk over it safely.

Furthermore, this evidence (reasonably and favorably construed with reference to the contentions of plaintiff), shows that the diagonal step was not the proximate cause of Mr. Boyd's injury. Not only did Mr. Yocum ascend the step directly before his eyes, but either version of Yocum's conversation with him shows that Mr. Boyd fell, after he had *stepped* off the balcony step, because of his knee or knees (giving way or going from under him), and not because he failed to see the step, fell off the step, or had his feet slip from the step. Since the evidence shows that he said he fell after he *stepped* off the step, a case cannot be made on the theory that he fell because he did not know that there was a step. Certainly the most that could be said of this evidence is as said in Peck v. Yale Amusement Company, supra, "no court could say just what did cause (his) fall." Plaintiff had the

burden to show a cause connected with some negligence of defendant and is not entitled to a verdict which could only be based on speculation and conjecture.

The judgment of dismissal is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

### On Motion for Rehearing.

HYDE, C.—Plaintiff's motion for rehearing states as its ground that a question decisive of the case, and duly submitted, has been overlooked; namely, that evidence of previous accidents at the same place is admissible not merely to show knowledge of a defective condition but to show also that the place was dangerous. We think it advisable to clarify this matter. The opinion does not mean that such evidence is inadmissible or that it cannot be considered on that issue; but it does mean that, in this case, it would not make sufficient substantial evidence to make a jury case on that issue, and it holds that such evidence is not *alone* sufficient to prove negligent construction or defective condition. We hold that, even if such evidence as was offered be considered, nevertheless, all the evidence taken together viewed most favorably with respect to plaintiff's case, fails to show any defective condition or a construction that was not reasonably safe. Such evidence is only circumstantial evidence, at most, and the mere fact that evidence of certain circumstances is admissible does not mean that such evidence *alone* amounts to sufficient substantial evidence to make a jury case.

In the United States Supreme Court case cited by plaintiff, District of Columbia v. Armes, 107 U. S. 519, 2 Sup. Ct. 840, 27 L. Ed. 618, there were three steps in the middle of a sidewalk, which, at a distance of twelve feet, paralleled the curb, and which caused an abrupt descent of about two feet for a considerable distance in all of that part of the sidewalk more than twelve feet from the curb. That was very unusual sidewalk construction. Nothing was put there to guard or warn pedestrians and there was no mention of any light there at night, when the plaintiff in that case fell. The court said that other accidents at this place were "circumstances which, *with other evidence,* tended to show the dangerous character of the sidewalk in its unguarded condition;" and that "they also tended to show that the dangerous character of the locality was brought to the attention of the city authorities." It is clear that, even without evidence of previous accidents, there was substantial evidence of an unsafe condition of the sidewalk.

This case is cited by this court in Charlton v. St. Louis-San Francisco Railway Co., 200 Mo. 413, 98 S. W. 529, where the negligence alleged was erecting and maintaining a water crane too close to a railroad track. This court held that it was proper to show that the water crane previously struck a man on a car, because "it tended to show the nearness of the crane and its appendages, and, hence the incident dangers." The court also pointed out the "line of fire cases holding that the escape of fire from other engines at other times may be shown." Of course, other evidence showed that the crane was negligently located and maintained with "no legitimate necessity for maintaining" it there. There was likewise other substantial evidence to show a defective or unsafe condition in such cases cited by plaintiff as Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 52 S. W. (2d) 839; Manson v. May Department Stores Co. (Mo. App.), 71 S. W. (2d) 1081; Metz v. Kansas City, 229 Mo. App. 402, 81 S. W. (2d) 462. The Charlton case is cited in Lake Superior Loader Co. v. Huttig Lead & Zinc Co., 305 Mo. 130, 264 S. W. 396, and from the discussion therein the rules governing admissibility of such evidence may be stated to be that "there is no dispute about the general rule which ordinarily excludes evidence of independent events and occurrences which are not directly connected with the matter in dispute;" but that there is a well-established "exception to this general rule, which exception, in a proper case, lets in evidence of the 'tendency, capacity or quality of a material object' by proof of its operation (or, we may add, *its effect*) under conditions essentially similar;" and that "in respect of a ruling on offered evidence of this kind the trial court is vested with a discretion which will not lightly be overruled." Nevertheless, even if such evidence is admitted, whether in the particular case there is negligent construction, which makes the structure not reasonably safe for its purpose and contemplated use, is sometimes a question for the court and not for the jury. We hold that it is for the court and not for the jury, in this case where the condition was so open and obvious that it could be seen by anyone who would look, and where anyone in the exercise of ordinary care could walk over this step, landing and balcony with safety.

The motion for rehearing is overruled.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.