16260

BAGWELL v. McLELLAN STORES CO.
(57 S. E. (2d) 257)

*Messrs. Watkins & Watkins,* of Anderson, *for Appellant,*

*Messrs. Oscar H. Doyle and Francis R. Fant,* of Anderson, *for Respondent,*

September 8, 1949.

OXNER, Justice.

This is an action to recover damages for personal injuries sustained by respondent as a result of slipping and falling on the floor of a store operated by appellant. The trial resulted in a verdict for respondent in the sum of $4,250.00. The appeal presents two questions: (1) Did the Court err in refusing appellant's motion for a directed verdict on the ground that there was no proof of actionable negligence?

(2) Did the Court err in the admission of certain testimony claimed by appellant to be hearsay?

On the afternoon of March 24, 1948, a clear day, respondent, a widow sixty-six years of age, entered the store of appellant at Anderson and purchased four metal curtain rods. As she was walking along the aisle in leaving, carrying the metal rods and a man's coat wrapped in a package, she said that "all at once my feet went from under me like I was on ice." Several customers in the store and the assistant manager immediately came to the scene and rendered assistance. It developed that respondent was rather seriously injured and shortly thereafter she was removed to the hospital.

The only allegations in the complaint relating to the floor being defective or unsafe are as follows: "That the store building in which the defendant conducts its business is very old and the floor of same has been repeatedly refinished on the surface and at some places including the place where plaintiff fell, is not level and the refinishing process, together with the constant use of cleaning oil and cleaning preparations caused some places on the floor, including the place where the plaintiff fell, to become excessively slick to (so) that when plaintiff stepped onto the excessively slick and slightly uneven place on the floor the weight of her body caused her feet, with great suddenness, to slip and her body to fall."

Respondent testified that at the time of the accident she was wearing a "black dress and light flesh colored stockings", and that when she was later able to examine this dress, there was "a spot, looked like a greasy spot, down the side" of it. Several of her witnesses who saw her immediately after the accident observed a discoloration on her left stocking but gave rather varied descriptions of its appearance. One said that it was a "brownish dark spot". Another testified: "The hose was soiled around the ankle. The best I could tell you it was a soiled place around the ankle, just a little above and around the ankle. It looked just soiled." Only one of her

witnesses, a Mrs. Harper, described it as "greasy". On cross examination she testified:

"When she stood up and I dusted off her clothes. It was dusted off. There was a soiled place on the calf of her leg. Her hose was not torn and her leg was not skinned or bleeding.

"Q. And you brushed that with your hand, and you tried to brush that dirt off? A. Yes, sir.

"Q. Now, it was largely dust, wasn't it, Mrs. Harper? A. Well, there was some grease. I don't think that a lady would go down town with her hose greasy like that. It definitely was greasy.

"Q. Was it sticky? A. No, it wasn't sticky. I didn't get any on my hand.

"Q. It didn't come off on your hand? A. The loose dust brushed off there. The grease on the hose didn't brush off.

"Q. Your hands didn't get greasy from dusting her hose off? A. I didn't look. I just brushed them like that I didn't look at them. I couldn't say.

"Q. Did that place feel damp? Could it have been a damp place that discolored her stocking? A. I didn't notice it feeling damp especially. It was just a greasy spot.

"Q. By greasy, you mean it was dark and didn't brush out easily when you brushed it with your hand? A. Yes.

"Q. You don't mean it was necessarily kitchen grease or oil? A. It was dirty, greasy, whatever it was, it was dirty.

"Q. It was a discoloration of the hose and didn't dust out easily when you dusted it with your hand? A. That's right.

"Q. But you don't actually say you got grease on your hands? A. No, I didn't. I didn't look.

"Q. You didn't notice any grease on her coat? A. No, sir, I didn't.

"Q. Did you notice any grease on her arm where she propped herself up? A. No, sir, I didn't look. I didn't notice any grease.

"Q. Did you notice any grease on her shoes? A. No, sir, I didn't look. I just noticed this on her hose.

"Q. And you didn't notice any grease on the floor, did you, Mrs. Harper? A. Well, nothing except the dark floor. No, there wasn't actually any grease at that spot she fell any more than the whole floor was dark like any well-used floor.

"Q. Did you see anything on the floor at the point where she fell different from the floor in the other parts of the building? A. No, sir, I didn't.

"Q. There was no grease there? No accumulation of grease at that point, was there? A. Well, no more than was on the other part of the floor.

"Q. And you say it was a dark floor? A. Yes.

"Q. Did you rub your hand along the floor to see if grease came up? A. No sir, I didn't."

Mrs. Harper further stated that she "didn't see any marks on the floor that might have been made by Mrs. Bagwell just as she fell". This witness also testified that shortly after the accident, the assistant manager of the store, while assisting respondent, remarked: "I have slipped on this floor several times myself."

Respondent's brother testified:

"I went to see the floor at McLellan's Store along in the summer with one of my brothers. We examined the condition of the floor just generally. It is a pine floor, looks to be what you would call hard pine floor. We looked around the different aisles. We had been told where she fell and examined the floor there, and found it practically the same condition there that it is a lot of other places. The floor is worn right smart up and down the aisles. Next to the side of the counter, it is not worn so much. It is darker and there is a dark oily looking piece of wood a few inches from the side of the counter. The last time I looked it was about the same condition. The top of the counter hangs over a few inches. What I describe is next to the bottom of the counter along the floor by the side of the counter. I put my fingers down and felt it. I didn't get any grease on my hand then. It seemed slick. I didn't get any grease. It was dark, but I

didn't actually get any on my hand.   *   *   *   The place
I am talking about, the only place that I felt smooth was
against the base of the counter and underneath that over-
hang. I didn't put my hand out in the center of the aisle.
The place that is darkest is, I would say, about six to seven
inches from the edge of the counter. I couldn't say whether
a person could walk underneath that overhang.   *   *   *
The floor seemed to be springy. It gives a little bit like it
had been a floor put on top of another floor. It seemed to be
worn or 'givey' in places. I didn't measure the overhang of
the counter. It has a table effect. The top of the counter
hangs over a little like that table there. A person can get her
feet along there and then step back some from the counter.
That streak that I saw is next to the foot of the counter. A
person examining goods on the counter can put a foot on that
place. You naturally walk up to that table and put your foot
up against the counter."

The left shoe worn by respondent at the time of the ac-
cident, "a black pump, with a medium heel, the heel hav-
ing a rubber tap", was introduced in evidence and the rec-
ord states that there was "no oil, grease or other foreign
substance on the shoe."

The assistant manager of the store denied making the
statement attributed to him by Mrs. Harper and stated that
he had never slipped on the floor of this store. He testified
that he carefully inspected it after respondent was sent to
the hospital and found nothing which would cause one to
fall and saw no "skid marks". He further testified that each
night and several times during the day the floor is swept
by two porters with a broom but nothing is used on the
floor in doing so; that three or four times a year, after
store hours, "Myco-sheen" is applied on the floor with a
mop for the purpose of keeping the dust down; and that
Myco-sheen was applied two days before respondent's ac-
cident. The manager of the store testified that he also ex-
amined the floor after the accident and found no grease,
oil or water and saw no marks indicating that anyone had

slipped on it. He said that Myco-sheen evaporates much quicker than water and its application does not make the floor slick. A representative of the manufacturer of Myco-sheen described this compound as "a combination of solvents and gums. The solvent is in the cleaner. The gums put a protective surface on the floor to cause non-slip.   *   *   * There is no grease in it." He said that it was widely used by department stores. Another witness for appellant, who had been in the construction business for a period of forty years, testified that the floor of this store was laid under his supervision when the building was renovated in 1932 or 1933; that it is a "rift pine floor, that is, edge grain", laid over a sub-floor which is standard construction; that he examined the floor after respondent's accident and found that although in some places the planks were worn, the floor was in "good shape" considering the wear upon it for fifteen years; and that he considered it "a safe floor." He further stated: "I couldn't see any differense between the different aisles, as to the condition of the floor. Wear tends to make a rift pine floor ridgy.   *   *   *   I didn't notice in going over it that I could feel it given (give) under my feet."

The principles governing liability in a case of this kind are very simple and well settled. One who operates a mercantile establishment is not an insurer of the safety of those who enter his store but he does owe them the duty of exercising ordinary care to keep the aisles, passageways, and such other parts of the premises as are ordinarily used by customers in transacting business in a reasonably safe condition. *Bradford v. F. W. Woolworth Co.,* 141 S. C. 453, 140 S. E. 105; *Pope v. Carolina Theater,* 172 S. C. 161, 173 S. E. 305; *Perry v. Carolina Theater,* 180 S. C. 130, 185 S. E. 184; *Anderson v. Belk-Robinson Co.,* 192 S. C. 132, 5 S. E. (2d) 732; 38 Am. Jur., page 791. Our inquiry is whether there is any evidence from which a violation of this duty may be reasonably inferred.

This case presents some unusual features. Ordinarily liability is sought to be established upon the theory that at some particular point there was grease, oil or other foreign substance on the floor. Here there is no evidence that the condition at the place where respondent fell was any different from that which prevailed elsewhere in the store. It seems to be conceded that the floor is old and there is testimony that it is "ridgy" and "givey" in places but not to the extent of rendering it unsafe. Doubtless the floors of hundreds of stores in this state are in similar condition. Moreover, it is not shown that it was "givey" at the place of the accident. There is testimony to the effect that a streak about five or six inches wide alongside the base of the counter under its projection was darker than the other portion of the aisle. Respondent's brother said that this area was "dark oily looking", "seemed slick" and "felt smooth". He does not say, however, that its condition was calculated to cause one to slip or fall. The area described would naturally look different from other parts of the aisle because it is little used. There is no testimony showing that respondent was using this portion of the aisle when she fell. On the contrary, she says that she fell as she was walking out of the store and not looking at anything specially. She testified: "I was walking along pretty close to Counter No. 7 and was close to it when I fell. I just turned right at the end of Counter 7 and made about one step." It is stated in respondent's brief that she "fell somewhere about the middle" of the aisle. In addition to this, there was no mark or other evidence indicating that she had slipped on this area.

Nor do we think the discoloration on her stocking and her dress was sufficient to establish negligence. This condition could have easily resulted from falling on almost any floor constantly used by the public. It is difficult to determine what Mrs. Harper meant by the statement that respondent's left stocking was greasy. The cross examination rather indicates that she was using the word "greasy" synonymously

with "dirty". When asked whether there was any grease on the floor, this witness replied, "well, nothing except the dark floor. No, there wasn't actually any grease at that spot she fell any more than the whole floor was dark like any well used floor." She admitted that the floor at the point of the accident was no different from other parts of the floor. This witness did not claim that the floor was generally unsafe. If respondent's witnesses who carefully examined this floor were unable to find anything in the aisle calculated to cause her to slip or fall, upon what theory can it be contended that appellant negligently allowed the floor to remain in an unsafe condition?

We next consider the testimony to the effect that the assistant manager stated: "I have slipped on this floor several times myself." He denied making this statement but for the purpose of this discussion we must assume that he did. While it is generally agreed that such testimony is relevant upon the question of notice or knowledge of the condition of the floor, there is quite a diversity of opinion as to whether it is admissible to show negligence. 38 Am. Jur., Negligence, Section 314. *Boyd v. Logan-Jones Drygoods Co.,* 340 Mo. 1100, 104 S. W. (2d) 348; *Branch v. Klatt,* 173 Mich. 31, 138 N. W. 263; *Reynolds v. W. T. Grant Co.,* 117 W. Va. 615, 186 S. E. 603. This question need not now be decided since the testimony in this case was admitted generally without objection. Under all the authorities it is held that before such testimony can be considered, it must appear that the former accidents happened under circumstances substantially the same or similar to those existing at the time of the injury for which suit is brought and must not be too remote in point of time. The testimony here meets neither of these qualifications. The assistant manager could have slipped on this floor when it was being mopped with Myco-sheen or under other circumstances wholly dissimilar to those existing when respondent was injured.

After giving the respondent, as we must, the benefit of every reasonable inference to be drawn from the testimony, we cannot escape the conclusion that the Court erred in refusing appellant's motion for a directed verdict. Support for this conclusion will be found in *Pope v. Carolina Theater, supra*, and *Pace v. J. C. Penny, Inc., et al.*, 182 S. C. 127, 188 S. E. 659.

The remaining question relates to the admission of certain testimony. Mrs. Mason testified that about five seconds after the occurrence an elderly lady came up and inquired as to the cause of the accident, to which some lady whom the witness did not know replied: "The floor has just been oiled and she fell." No one was able to identify the declarant. It is not contended that she was an employee of the store. We are not altogether clear as to the meaning intended to be conveyed by the statement. It is susceptible to the construction that the floor had just recently been oiled. If so, it is in conflict with respondent's own testimony. Respondent says in her brief that the declarant meant "that the floor at that time had the appearance of having been recently oiled or it was slick looking and may mean that she actually saw oil on it." Under either construction, we think the Court below erred in admitting this testimony upon the theory that it was part of the *res gestae*.

It must be conceded that the statement in question was sufficiently near in point of time and place to come within the *res gestae* rule, but another essential requirement is that "it must possess the very characteristic of being well calculated to unfold the nature and quality of the main fact, and so harmonize with it as to obviously constitute a single transaction." *State v. Long,* 186 S. C. 439, 195 S. E. 624. The declaration must explain, elucidate or in some way characterize that event. *Lazar v. Great Atlantic & Pacific Tea Co. et al.*, 197 S. C. 74, 14 S. E. (2d) 560; *Marks v. Pearlstine & Sons,* 203 S. C. 318, 26 S. E. (2d) 835. The purpose of permitting the introduction of this class of evidence is to prove facts not opinions.

If the declarant intended to state that the floor had been recently oiled, she was merely narrating an antecedent occurrence. If she intended to describe the appearance of the floor, her statement did not elucidate or characterize the main event but merely represents a conclusion on her part from what she observed either before or after the accident. It might also be noted that there is no testimony showing that this declarant saw the accident.

Respondent contends that the ruling of the trial Judge is sustained by *York v. Charles*, 132 S. C. 230, 128 S. E. 29, 30. That was an action for damages growing out of an automobile collision. The defendant testified that a bystander remarked immediately after the collision, in the presence of the driver of plaintiff's car: "It is clearly the other man's fault." It was held that this declaration was admissible as a part of the *res gestae*. Four members of the Court participated in the decision, two of whom concurred only in the result. An interesting comment on this case will be found in an exhaustive annotation in 163 A. L. R., at pages 186 and 189. The testimony in the *York case* would have perhaps been admissible, apart from the theory of *res gestae,* as in the nature of an admission to be implied from the silence of plaintiff's driver after the statement was made in his presence. Certainly the holding in the *York case* should not be further enlarged so as to warrant the admission of a declaration of the character now before us.

Many of our cases relating to the statements of servants and agents immediately after an occurrence are not applicable to the situation before us. Courts are generally more liberal in admitting spontaneous declarations of an agent or servant of the defendant. And, too, a number of these cases involved statements that were competent as an admission, although not a part of the *res gestae*. Illustrative of the line of decisions last mentioned is *Price v. American Agricultural Chemical Co.,* 173 S. C. 518, 176 S. E. 352.

The judgment appealed from is reversed and the case is remanded for entry of judgment in favor of appellant in accordance with Rule 27.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.