William B. CROSS, Appellant,

v.

M. R. PASLEY, Appellee.

No. 16092.

United States Court of Appeals
Eighth Circuit.

Sept. 2, 1959.

Rehearing Denied Sept. 22, 1959.

See also 8 Cir., 267 F.2d 824.

Solbert M. Wasserstrom, Kansas City, Mo. (Bellemere & Bellemere, Kansas City, Mo., on the brief), for appellant.

Albert Thomson, Kansas City, Mo. (Davis, Thomson, Vandyke & Fairchild, Kansas City, Mo., on the brief), for appellee.

Before GARDNER, VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

In this action appellee, M. R. Pasley, plaintiff below, seeks to recover the amount paid by him for certain securities alleged to have been sold in violation of the Missouri Securities Law (commonly referred to as "Blue Sky Law"), Chapter 409, R.S.Mo., 1949, particularly § 409.240 [unless otherwise indicated, Missouri citations are to Vernon's Annotated Missouri Statutes], and the Federal Securities Act of 1933 (Title 15 U.S.C.A. §§ 77e, 77l). Trial of the case was commenced before a jury, but upon determination by the parties that the evidence presented no substantial dispute as to any material issue, the jury was discharged, and the cause submitted to the court. From the judgment in favor of plaintiff for $14,771.32, the amount allegedly paid by him for the securities, together with $1,477.13, as attorney fees,[1] the defendant has prosecuted an appeal to this court.

Jurisdiction to determine whether the transactions were in violation of the Missouri Blue Sky Law is present because of diversity of citizenship and amount involved. As to the alleged federal violation, jurisdiction is reposed by Title 15 U.S.C.A. § 77v.

The basis for the judgment was a specific finding by the trial court that the sales and offerings were in violation of both the Missouri and Federal Acts, supra.[2] The defendant challenges the judgment, asserting in effect that the findings of the court are clearly erroneous. We first direct our attention to the Missouri statute. The defendant contends that the parties were engaged in a joint adventure, and that therefore their transactions were not within the contemplation of the Missouri statute.

The defendant's position makes necessary a summary of the pertinent facts giving rise to the litigation.

Defendant and one Keith Chasteen formed a partnership known as C & C Petroleum Company. Letterheads of this firm were styled:

"C and C Petroleum Company
Leases—Royalties—Production
Fairfax Building
W. B. Cross   Kansas City 5,   Missouri
Keith Chasteen   Baltimore 1–8447"

The partnership was formed for the purpose of discovering and producing oil. Defendant, or he and Chasteen, owned oil leases in Oklahoma and Kansas. In order to obtain funds to finance the drilling of wells the partnership entered upon the venture of selling interests in the oil leases. To accomplish and facilitate that objective the partnership made arrangements with one Frank E. Otey, a salesman, under which Otey was "to raise or help them raise money among various individuals to explore for oil and drill wells in connection therewith."

---

1. § 409.240 of Missouri statute provides for recovery of reasonable attorney fees.

2. By supplemental findings entered August 13, 1959, the trial court found that all transactions upon which the suit is based were consummated in the State of Missouri.

Otey was not paid a salary, but worked on a commission of ten per cent (10%) of the total amount brought in from the sale of the interest, including drilling costs. Otey testified that he operated under no limitations with respect to prospective purchasers. In his words, "the man didn't have to be tall or short, or anything, in order to get in on these leases. Anybody who wanted to and whom I thought I could sell some of this drilling operation to, I would be interested in having them come in, because I would get my commission on that." It appears that Otey contacted 35 or 40 individuals and was successful in obtaining 30 or 35 as investors in the various leases. Apparently, defendant and Chasteen retained a full ⅛ interest each in the leases and sales were made of 1/32 interests in the remaining ¾ interest. In each case, a separate charge was made for the actual leasehold interest, but as an integral part of the deal, each purchaser was required to put up a substantial sum at the same time for the cost of drilling test wells. Thereafter, each buyer agreed to pay his proportionate share of completion costs. The record also indicates that defendant and his partner did not put up any money toward the cost of drilling the test wells. This "free ride" was deemed compensation for their services as "operators." They did, however, share their proportionate cost of completing wells. So much for the generalities.

Plaintiff is one of the numerous individuals contacted by defendant or his representatives, who invested in the oil leases. Over a period of approximately 8 months, beginning in December, 1955, plaintiff invested a total of $15,141.79 in leases which yielded him a total return of $370.47. The last wells were drilled in August, 1956, and this suit was filed October 4, 1956. The amounts invested, and the interests acquired in different wells, are revealed by the following exhibit:

"Plaintiff's Exhibit 1.

Summary.

| Name of Well | Int. | Payments | Receipts |
|---|---|---|---|
| Thrasher No. 1 | 1/32 | | |
| Meek No. 1 | 1/32 | $ 4,016.79 | $370.47 |
| Parker No. 1 | 1/32 | | |
| Thrasher No. 2 | 1/32 | 150.00 | |
| Meek No. 2 | 1/32 | 475.00 | |
| Padgett | 1/16 | 1,850.00 | |
| Jones No. 2 | 1/16 | 3,300.00 | |
| Jones No. 1 | 1/16 | 1,850.00 | |
| Estate No. 1 | 1/16 | 3,500.00 | |
| Total | | $15,141.79 | |
| | | 370.47 | |
| | | $14,771.32" | |

The sale of the interest to plaintiff in each lease was confirmed by a letter from the partnership, and ultimately consummated by written assignment of the interest purchased. The confirmation letter in regard to the first three leases is typical of the others, which differed only in land descriptions and sums of money to be paid. It contained this language in part:

"This letter confirms our recent verbal agreement under which you

have agreed to acquire and purchase, and we have agreed to assign or cause to be assigned to you, an undivided 1/32nd of the 7/8th working interest subject to its proportionate share of None of 7/8th overriding oil and gas royalty interests in the oil and gas mining lease on and covering all of the land described as [legal description follows].

"We agree to drill, or cause to be drilled, a test well for oil and gas at the drill site location described as Prescribed by geologist on each of three leases and agree that such wells shall be drilled to a depth sufficient to test the Mississippi Chat formation expected to be encountered to a depth of approximately 2000 feet, unless oil or gas in paying quantities, or granite, or other impenetrable substance is encountered at a lesser depth. For the drilling of this test well we agree to dig the pits and celler and to furnish all of the labor, water, materials, machinery, and supplies necessary or convenient for the drilling of the well to the above depth.

"Yourself and your representatives shall be entitled to free access to the derrick floor at all times, at your risk, and you shall be given all available information with reference to the depth and condition of the well and the formations encountered during the drilling of the same.

"As full compensation to us for your interest in said lease you agree to make payment to us of the sum of $225.00, and as compensation for your share of the cost in connection with drilling the three test wells hereinbefore mentioned you agree to make payment to us of the sum of $2,025.00 for your proportionate part of contract as above mentioned.

\* \* \* \* \* \*

"It is agreed that our respective rights and obligations hereunder are those of independent contractors, and nothing herein contained shall be deemed to create any relation of mining or other partnership as between us, \* \* \*."

Also material to one of the issues are the following portions of the more formal operating agreement entered into between the partnership as "Operator," and a number of the investors, designated in the agreement as "Non-Operator" :

It Is Further Agreed by the parties hereto that C & C Petroleum Company, shall be the 'Operator' of the above described lease and shall have the active supervision thereof to the extent and for the purpose set out in Exhibit 'A'."

\* \* \* \* \* \*

"Operator shall have full and complete control and, subject to the terms hereof, shall conduct and manage the operation and development of said leases for the production of oil and gas, or either of them for the joint account of Operator and Non-Operator."

\* \* \* \* \* \*

"It is not the purpose or intention of this instrument to create, and this agreement shall never be construed as creating, a joint venture, mining partnership or other relationship whereby any party shall be held liable for the acts, either or omission or commission, of any other party or parties hereto."

Concededly the interests in the leases were not registered as required by the Missouri Act. Neither does defendant question that such interests constituted securities as defined by § 409.020(3). Thus the basic issue is delineated to the rather narrow question of whether the transactions are exempted from operation of the law.

█  While § 409.040 exempts certain *securities*, and § 409.050 exempts certain *transactions*, it is clear that transactions between joint adventurers do not fall within the categories or classifications enumerated therein. Defendant does not premise his contention on the statute, but rather argues that from

the teachings of the courts and other recognized authorities, the question has been put to rest, and that transactions between joint adventurers are not proscribed by Blue Sky Laws. He cites, among others, such cases as Hammer v. Sanders, 8 Ill.2d 414, 134 N.E.2d 509, certiorari denied 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79; Campbell v. Degenther, D.C.W.D.Pa., 97 F.Supp. 975; Brown v. Cole, 155 Tex. 624, 291 S.W.2d 704, 59 A.L.R.2d 1011; Lindemulder v. Shoup, 258 Mich. 679, 242 N.W. 807, and 53 C.J.S. Licenses § 75, p. 764.[3] The question has not, to our knowledge, been ruled on by the Supreme Court of Missouri, although it was raised and presented to that Court in Gales v. Weldon, 282 S.W.2d 522. Defendant construes the language of the Court in that case as making "it quite plain that the Missouri Supreme Court will, in an appropriate case, hold that the Missouri Blue Sky Law does not apply to joint adventures." Because of the very nature of a joint adventure, and the relationship of the parties engaged therein, we are inclined to the view that the Missouri statute is not designed or intended to cover transactions between joint adventurers or partners. However, we do not attempt to forecast how the Missouri Supreme Court will rule if called upon to do so, neither are we required to make an independent determination of the question. This for the simple reason that, as in Gales, supra, we are of the opinion that there is no evidentiary basis for holding that plaintiff was a party to a joint adventure, and that the transactions in question were between joint adventurers.

■ While we recognize that agreements concerning drilling operations may at times result in a relationship of joint adventure, 24 Am.Jur., Gas and Oil, § 105, it is elementary that such a relationship can arise only where the parties intend to so associate themselves. See 30 Am.Jur., Joint Adventures, § 8.

■ The factors and elements generally required to bring a joint adventure into existence are clearly pointed up in Gales at page 527 of 282 S.W.2d:

"A 'joint adventure' is founded entirely on contract, either express or implied. It can exist only by the voluntary agreement of the parties to it. It has been defined as 'an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.' 48 C.J.S. Joint Adventures § 1a. It is in the nature of a partnership, generally governed by the same rules of law, the principal difference being that a joint adventure is usually limited to a single transaction. As a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in such losses as may be sustained. 48 C.J.S. Joint Adventures § 2a."

Here, of vital importance is the letter of confirmation and the operating agreement which expressly negate the theory of joint adventure, or partnership. The former stated that "nothing herein contained shall be deemed to create any relation of mining or other partnership as between us, * * *" and the latter provided that " * * * this agreement shall never be construed as creating, a joint venture, mining partnership or other relationship whereby any party shall be liable for the acts either o[f] omission or commission, of any other party or parties hereto." Furthermore,

---

3. We do not understand the Hammer and Campbell cases as being ruled upon a finding that parties were engaged in a joint adventure. In the Brown case, the court by dictum observed that the Texas Act does not apply to joint adventurers, but ruled that parties there were not joint adventurers. In the Lindemulder action, it was ruled that 10 men, each contributing $500 to purchase an oil lease, were engaged in a joint venture and such a venture was exempt from the Michigan statute.

we do not view the facts and circumstances as creating a relationship formed for the purpose of carrying out a single business enterprise or a single transaction. Indeed, the record compels the conclusion that the defendant embarked upon a rather extensive enterprise to discover and produce oil; the printed letterheads and statements of the partnership so indicate; a salesman was engaged who was given carte blanche authority to raise money by selling interests in oil leases, and the only thing required of a prospective purchaser was that he have the funds necessary to secure the interests. Mutuality of control is absent; the evidence supports the trial court's finding that "defendant had sole control over the drilling of the well, [and] although the holders of interests therein had a right to enter upon the premises to view the progress of the drilling, they had nothing to do with its supervision * * *."

Further elaboration of the facts before us is unnecessary. The conclusion is inescapable that the transactions under scrutiny constituted sales of securities proscribed by the Missouri Blue Sky Law, and the findings of the trial court to that effect are correct. Inasmuch as plaintiff is entitled to proceed under the Missouri statute, we deem it unnecessary to consider application of the Federal Securities Act.

We do have for consideration and disposition the contention that the plaintiff failed to make adequate tender of the assigned leasehold interests. Section 409.-240 of the Missouri Act provides that the "person making such sale * * * shall be * * * liable to such purchaser in an action at law in any court of competent jurisdiction upon tender to the seller in person or in open court of the securities sold or of the contract made for the full amount paid by such purchaser, together with all taxable court costs and reasonable attorney's fees in any action or tender under this section; * * *."

■■ The tender was made in this manner. The complaint stated: "(t)he plaintiff tenders in court all of said securities and states that he has received $370.47 as income from said securities." In rendering judgment the court allowed credit for the amount of income received by plaintiff. At the close of the trial, plaintiff, through counsel made this statement: "Now, if the Court please, Mr. Pasley tenders back any interest he may have as required under the Missouri statute; any interest he may have he now tenders them to the defendant as required under our statutes." By supplemental findings, the trial court found that the tender was technically insufficient under the Missouri statute but stated: "However, the question was not raised by the defendant either during the trial or in his Motion for New Trial, and the first time it was called to the attention of the court was in Defendant's Supplemental Suggestions in support of his Motion for New Trial. It is the conclusion of the court that tender of the securities may be waived and that the defendant waived the statutory requirement for physical tender." Does the Missouri Securities Act require physical tender of the securities to the seller in person or in open court? The answer has not been supplied by the Missouri courts. In 53 C.J.S. Licenses § 77, p. 782, dealing with remedies for violations of Blue Sky Laws, this pronouncement is made:

"In order to entitle the purchaser to recover that with which he has parted, he must restore, or tender or offer to restore, that which he has received, unless restoration or a tender is excused." Louis Loss in his treatise on Securities Regulation, states at p. 969: "The approach of the courts to the question of what constitutes good tender varies considerably." This is borne out by Annotation in 87 A.L.R. 42, at pages 115–116. From our research it appears that the question has been resolved by a consideration of the attending facts in each case. While we believe the better practice to be that a physical tender of the securities should be made to the seller in person or in open court, we are persuaded

to hold that the conduct of defendant throughout the proceeding renders impotent any complaint which goes to the form of the tender. The trial was focused upon the vital question of whether the transactions came within the statute. The tender as made in the complaint was not challenged, it was not questioned at any stage of the trial. When plaintiff renewed the tender at the close of the case defendant voiced no objection as to the sufficiency thereof. Upon conclusion of the introduction of the evidence, the trial judge expressed his opinion as to what issues were presented, which did not include the question of tender. If counsel for defendant entertained a contrary view he failed to make it known. In his motion for judgment or in the alternative for a new trial defendant failed to challenge the validity of the judgment because of an insufficient tender. All of this leads to the inescapable conclusion that defendant regarded the tender as sufficient and his claim to the contrary is without merit.

■ Defendant also complains of the amount of the judgment, asserting that in no event is plaintiff entitled to recover more than $715, said to be the amount paid for plaintiff's interests in the leases.[4] Defendant would differentiate between that figure and the additional sums paid by plaintiff for drilling costs, contending that the drilling expenses were not a part of the "investment."

The Missouri statute, § 409.020(3), defines the term "security" or "securities" to mean "any note; stock; * * * *investment contract; * * ** fractional* undivided interest in oil, gas, or other mineral rights; * * * any certificate, contract, receipt or instrument whatsoever representing or constituting evidence of, or secured by, title to or interest in any oil, gas or mining lease, * * *." [Emphasis supplied]. It is to be observed that this definition is nearly identical to that found in the Federal Securities Act, Title 15, § 77b (1), the difference being that the Missouri definition is more comprehensive. The answer to the instant question is found in S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. In that case each prospective customer was offered both a land sales contract and a service contract under which the Howey Company agreed to service citrus groves. Holding that an offering of units of the grove development coupled with a contract for cultivating, marketing and remitting the proceeds to the investors, was an offering of an "investment contract" within the meaning of the Securities Act, the Court stated at page 298 of 328 U.S., at page 1103 of 66 S.Ct: "In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidence by formal certificates or by nominal interests in the physical assets employed in the enterprise."

It is clear from the evidence, particularly the confirmation letters, that the

---

4. See Plaintiff's Exhibit 1, supra, p. 4.

Interests in Thrasher No. 1, Meek No. 1 and Parker No. 1 were initially purchased for $2,250—$225 of this amount being assigned as cost of the lease, and $2,025 as cost of test wells. An additional $1,-766.79 was advanced later for purposes of making further tests, completion, and miscellaneous expenses.

Apparently "Thrasher No. 2" and "Meek No. 2" were covered under the original lease and the amounts of $150 and $475, respectively, were invoiced as "development" or "completion costs."

The Padgett lease was initially purchased at a cost of $85 for the lease, plus $765 for test wells, or for a total of $850. An additional sum of $1,000 was advanced for completion.

The Jones No. 2, Jones No. 1, and Estate No. 1 interests were purchased for an initial outlay of $1,800, $1,250, and $2,250, respectively. We cannot ascertain from the record in what manner these sums were allocated between lease cost and test drilling. The balance invested in these 3 leases covered completion costs, and other expenses.

total amount that plaintiff was required to pay, was the consideration for the "investment contract." The amount allocated to the cost of drilling the test wells was an integral part of the entire transaction,—it was paid at the same time and for the purpose of rendering more valuable the primary securities. In addition, plaintiff was obligated to pay for future drilling expenses. In Whittaker v. Wall, 8 Cir., 226 F.2d 868, at page 872, this court, in ruling that plaintiff was entitled to recover payments made for equipment and second wells, stated: "It would be a perversion of the statute to allow remittances made in conjunction with a void and unlawful security to be exempt from restitution, and would permit unjust enrichment under the guise of statutory definition."

We have also considered defendant's contentions that plaintiff is barred by estoppel and laches, and that the court erred in refusing to permit him on the eve of trial to file a counterclaim, and find them without merit.

The judgment is

Affirmed.

On Petition for Rehearing.

PER CURIAM.

Defendant-appellant has filed a petition in which he asks for a rehearing or in the alternative a modification of our opinion.

The petition for rehearing is denied. However, upon further consideration we now entertain the view that the judgment entered by the trial court should be modified or supplemented to require plaintiff to formally reassign or relinquish the interests conveyed to him in the oil leases. We adhere to our holding that under the circumstances presented by the record the defendant cannot escape liability to plaintiff because of the form of the tender. Neither can plaintiff, in view of the tender made by him, and the judgment in his favor, successfully assert that he retains or owns any right, title or interest in the securities in question. Nevertheless, since the interests in the leases were conveyed by written instruments, at least one of which was duly recorded, plaintiff should by appropriate instrument, relinquish or reassign such interests in order to eliminate the possibility of a cloud being cast upon title to the real estate.

Accordingly, the judgment of the trial court is modified by adding thereto the following: "Plaintiff shall within thirty days from the date the mandate herein is filed in the District Court, execute and deliver to defendant a good and sufficient instrument whereby he shall fully and forever release and relinquish any right, title or interest acquired by him in the oil leases which are the subject of this action."