Merle R. COVERT and E. G. Walz and Bernadine Walz, Plaintiffs-Respondents,

v.

W. B. CROSS and Keith Chasteen, d/b/a C & C Petroleum Company, and Frank C. Otey, Defendants-Appellants.

No. 47462.

Supreme Court of Missouri,

En Banc.

Feb. 8, 1960.

Solbert M. Wasserstrom, Bellemere and Bellemere, Kansas City, for appellants.

Jack B. Robertson, Rogers, Field, Gentry & Jackson, Kansas City, for respondents.

DALTON, Judge.

This is an action under "The Missouri Securities Law," commonly referred to as the "Blue Sky Law," Sections 409.010 to 409.320 RSMo 1949, V.A.M.S., inclusive and particularly Section 409.240, to recover the amounts paid by plaintiffs for fractional undivided working interests in and for the development of certain oil leases, less the amount of income received, the purchasers having elected to rescind such purchases and having tendered back to the vendors reassignments of the mentioned fractional interests transferred to them. Plaintiffs also seek to recover interest and a reasonable attorney's fee as provided by the mentioned statute. Defendants filed an answer alleging that the transactions relied upon constituted joint adventures and were exempt from the mentioned statutes, and they further alleged the action was barred by laches, estoppel and because the plaintiffs were in pari delicto with defendants. Defendants Cross and Chasteen filed a counterclaim for alleged balances due from the plaintiffs for their proportionate share of the cost of completion of some eight oil wells involved in the transactions in question. The causes were submitted to a jury under given instructions, including Instruction No. 5 requested by defendants, by which instruction joint adventure was submitted. Verdict and judgment were for defendants on plaintiffs' petition and for the defendants Cross and Chasteen on their counterclaim, towit, for $2,430 against plaintiffs E. G. Walz and Bernadine Walz and $2,633 against plaintiff Merle R. Covert. Thereafter, the court sustained plaintiffs' motions to set aside the verdict and judgment and enter judgment for plaintiffs in accordance with their motions for a directed verdict tendered at the close of all the evidence. The court entered judgment for plaintiff Covert against all defendants for $6,976.98 and for plaintiffs E. G. Walz and Bernadine Walz against all defendants for $6,764.01, awarded plaintiffs $1,200 additional as attorney's fees and entered judgment for plaintiffs on the counterclaim of defendants Cross and Chasteen. In the alternative the court sustained plaintiffs' motions for a new trial for error in the giving of Instruction No. 5 requested by defendants. Defendants have appealed from the mentioned judgment and now contend that the court erred in overruling defendants' motion for a directed verdict as offered at the close of all the evidence and in entering judgment for plaintiffs notwithstanding the jury verdict.

The essential and decisive facts are not in dispute. In the latter part of 1955 the

defendants Cross and Chasteen formed a partnership under the firm name of C and C Petroleum Company and acquired three leaseholds on real estate located in Chautauqua County, Kansas, known as the Thrasher, Meek and Parker leases. To finance the development of these leaseholds, the partnership hired defendant Otey to secure additional investors. His compensation consisted of ten per cent commission on the investments he secured, including the cost of digging the first well on each leasehold. He was authorized to sign contracts on behalf of said defendants and he sold interests in a number of leases for them to some 30 or 40 different persons. He was not authorized to sell a working interest in any lease owned by the partnership, unless the buyer agreed to pay his proportionate part of the drilling costs. In defining a working interest in an oil lease the defendant Cross said that a person who purchases a working interest in an oil lease receives the assignment of a fractional interest in the lease carrying with it the right to participate in the income from an oil well on the premises, if a well is producing, and he also assumes the obligation of putting in whatever money is necessary to drill and complete the well; and that you can't buy a working interest in an oil lease without agreeing to put in the money to complete the well.

Late in December 1955 defendant Otey contacted plaintiff Covert and plaintiff E. G. Walz and offered them a package deal of fractional undivided working interests in each of three oil leases, towit, Thrasher, Meek and Parker. They had to buy an interest in each lease to get any of them and each of the two mentioned plaintiffs agreed to purchase an undivided 1⁄32 interest in a 7⁄8 working interest in each lease and they, thereafter, each paid $2,250 to defendants. The Walz check was dated January 6, 1956, and the Covert check January 25, 1956.

The oral agreements to purchase the working interests in the said leases were confirmed by similar letters. The letter to plaintiff Walz and wife, dated December 24, 1955, was accepted and signed by Walz on January 6, 1956. In part, it was as follows:

"This letter confirms our recent verbal agreement under which you have agreed to acquire and purchase, and we have agreed to assign or cause to be assigned to you an undivided 1⁄32nd of the 7⁄8th working interest subject to its proportionate share of none of 7⁄8th overriding oil and gas royalty interests in the oil and gas mining lease on and covering all of the land described as * * * [Legal description follows.]

"We agree to drill, or cause to be drilled, a test well for oil and gas at the drill site location described as prescribed by geologist on each of three leases and agree that such wells shall be drilled to a depth sufficient to test the Mississippi Chat formation expected to be encountered to a depth of approximately 2000 feet, unless oil or gas in paying quantities, or granite, or other impenetrable substance is encountered at a lesser depth. For the drilling of this [sic] test wells, we agree to dig the pits and celler [sic] and to furnish all of the labor, water, materials, machinery, and supplies necessary or convenient for the drilling of the well to the above depth.

"Yourself and your representatives shall be entitled to free access to the derrick floor at all times, at your risk, and you shall be given all available information with reference to the depth and condition of the well and the formations encountered during the drilling of the same.

"As full compensation to us for your interest in said leases you agree to make payment to us of the sum of $225.00, and as compensation for your share of the cost in connection with drilling the three test wells hereinbefore mentioned you agree to make payment to us of the sum of $2,025.00

for your proportionate part of the contract as above mentioned. * * *

"It is agreed that our respective rights and obligations hereunder are those of independent contractors, and nothing herein contained shall be deemed to create any relation of mining or other partnership as between us, and if this letter agreement is silent as to any matter or thing which may arise between us in connection herewith, then our respective rights and obligations in that regard shall be governed by the custom in the industry then prevailing with reference to the same. * * *"

A supplementary letter to plaintiff Walz dated January 3, 1956, was accepted and approved by both parties on January 6, 1956, the same date on which the confirmation letter was also signed and the $2,250 paid. In part, it read as follows:

"The contract recently sent you covering your commitment to an interest in our Chatauqua County, Kansas, drilling program, did not spell out two items that we believe are of mutual importance. The first item concerns a drilling date, binding C & C Petroleum Company to a starting date on operations at this site, the second, an agreement from each investor to stand his proportionate share of the cost of deepening any of the test wells to the Arbuckle Limestone formation if we had a dry hole in the Mississippi Chat.

"We therefore wish to include the following as amendments to the contract you now hold and your signature in the space provided below will constitute your agreement to make this letter a valid portion of the contract covering this project:

"1. The C & C Petroleum Company hereby affixes a drilling deadline of February 1, 1956, and agrees that drilling operations shall begin on the first of the three leases included in the Chatauqua-Osage Project, Chatauqua County, Kansas, on or before that time.

"2. Each interest holder agrees to make payment to C & C Petroleum Company for an additional sum of money if it is deemed adviseable [sic] to continue drilling operations on any of the test wells on the three leases in the Chatauqua-Osage Project, Chatauqua County, Kansas, to the Arbuckle Limestone formation, if oil and/or gas in commercial quantities is not discovered at lesser depths as specified in the original contract. It is agreed that the individual interest holder will be responsible for a proportionate share of such deepening work only in an amount equal to his interest in each lease and the deepening work will be done for him at the lowest practical cost on a turnkey basis. * * *"

A similar letter was sent to plaintiff Covert, who accepted and approved both letters. At the trial, defendants objected to the introduction of the first letter, insisting that "it is not a complete document without" the second letter and both were then offered and received in evidence.

After the plaintiffs had received and approved the letters of confirmation and the supplementary letters and had made the initial payments, as hereinbefore stated, they were given formal assignments of working interests in the three mentioned leaseholds. Thereafter, a form of Joint Operating Agreement was signed by the plaintiffs and others who had before or after purchased or retained undivided fractional working interests in the same three mentioned leases. This agreement in part provided:

"Whereas, it is the desire of the parties hereto to set forth the terms and conditions under which the above mentioned lease shall be developed, managed, and operated;

"Now Therefore, in consideration of the premises, it is agreed that the above described lease shall be developed and operated in accordance with the terms and provisions of an attachment here-

to marked Exhibit 'A', and made a part hereof by this reference.

"It Is Further Agreed that the proportionate interest of each party hereto is owned in and to the above described lease, and shall bear its proportionate share in and to all costs and expenses incurred in the operation, management, and development of such lease, in as follows: [Names of holders of fractional interests are here set out.] * * *

"It Is Further Agreed by the parties hereto that C & C Petroleum Company, shall be the 'Operator' of the above described lease and shall have the active supervision thereof to the extent and for the purpose set out in Exhibit 'A'. * * *"

Exhibit "A" in part provides:

"Operator shall have full and complete control and, subject to the terms hereof, shall conduct and manage the operation and development of said leases for the production of oil and gas, or either of them, for the joint account of Operator and Non-Operator. Operator shall perform and carry on such duties in accordance with good oil and gas field practices, in the interest of the parties hereto, and as an ordinary prudent operator, but shall have no responsibility whatever to Non-Operator for errors of judgment. Operator shall pay and discharge all costs and expenses incurred in connection with the development and operation of said leases and charge Non-Operator with its proportionate share thereof in the manner and upon the cost and expense basis provided for in a schedule attached hereto and marked Exhibit 'B', and by this reference made a part hereof. * * *

"It is not the purpose or intention of this instrument to create, and this agreement shall never be construed as creating, a joint venture, mining partnership or other relationship whereby any party shall be held liable for the acts, either of omission or commission, of any other party or parties hereto. It is provided further that all of the terms and provisions hereof shall be available to and binding upon the respective heirs, executors, administrators, successors and assigns of the parties hereto, excepting as expressly limited herein. * * *"

The first well drilled on the Thrasher lease is referred to as "Thrasher No. 1." It was completed and such completion consisted of lowering steel casing into the well and cementing it in place, shooting and fracturing the rock formation, installation of a pump, tubing and tanks and a separator. The plaintiffs paid their proportionate part of the cost of completion; but it only produced salt water. The next well was drilled on the Meek lease. It was completed and produced gas. Plaintiffs paid their proportionate part for the completion of this well and received their proportionate part of the proceeds from the sale of gas, towit, $122.78 for each $\frac{1}{32}$ interest. A well was drilled on the Parker lease and completed, but it produced no oil in paying quantities.

Thereafter, defendants Cross and Chasteen purchased the Coe lease from one Padgett and sold and transferred fractional undivided working interests in this lease to plaintiff Covert and to plaintiffs E. G. Walz and wife. A well was drilled and completed on this lease and it proved unproductive.

Thereafter, on April 9, 1956, defendants Cross and Chasteen wrote to the plaintiffs giving the result of further investigation, recommending the drilling of additional development wells to the Peru Sand formation and asking plaintiffs' authorization to proceed with such wells. Each of the plaintiffs gave written authorization to the defendants to proceed. The contracts were evidenced by the letters and the acceptances of the parties and involved the further development of the Thrasher, Parker and

Meek leases. Thereafter, wells referred to as Thrasher No. 2 and Meek No. 2 were drilled and completed, but failed to produce oil in paying quantities.

Thereafter, defendant Otey on behalf of the other defendants sold to plaintiffs additional undivided fractional working interests in what is referred to as the Jones leasehold in Oklahoma real estate. Two wells were drilled on the Jones lease. They are referred to as Jones No. 1 and Jones No. 2. Both were completed and ultimately proved unsuccessful. The proceeds from the sale of oil from Jones No. 2 were distributed to each of the holders of a $\frac{1}{32}$ interest in the Jones lease in the sum of $397.49.

On each of the mentioned sales each purchaser of a working interest in a leasehold received a formal letter of confirmation and a formal assignment of interest in the leasehold and subsequently all purchasers and participants in the respective leaseholds signed Joint Operating Agreements with regard to the respective leaseholds. In each letter of confirmation the initial payment was divided between a payment for the leasehold interest as contrasted to an amount being paid for estimated drilling costs. The amount so allocated to the cost of the leasehold was approximately 10% on each lease. The reason for said division was that the Federal income tax law permitted a full deduction of drilling expense whereas the amount paid by each investor for his interest in the leasehold had to be treated for income tax purposes as a capital investment. Plaintiffs were not consulted with respect to such separations, but were required to pay the total of the two sums in order to purchase a working interest. The plaintiffs, however, did deduct the portion allocated as drilling costs as an annual expense on their income tax returns and capitalized the portion allocated to the leasehold cost. They later charged off the cost of their interests in the leaseholds.

Defendants Cross and Chasteen reserved to themselves a $\frac{1}{8}$ interest each in each well, except in the Jones lease where each had a $\frac{5}{32}$ interest. Their reserved interests were not chargeable with any part of the cost of drilling the initial well on each lease, but they were obligated to pay their proportionate share for completion costs and for drilling and completion of secondary wells in accordance with the contract. The defendants did not register any of the mentioned transactions or the subject-matter thereof, nor any of the securities or contracts under "The Missouri Securities Law," nor was defendant Otey registered as a securities salesman. See Sections 409.030 and 409.140. All sales of working interests in the several oil leases were shown by documentary evidence and the several contracts and assignments of interest were in writing and their execution is not in question. Further, the counterclaim filed by defendants Cross and Chasteen stated, as follows: "During the year 1956 plaintiff Covert purchased from said defendants fractional working interests in leases on certain real estate on which were drilled the following oil wells: Thrasher No. 1, Meek No. 1, Parker No. 1, Coe No. 1, Jones No. 1, Jones No. 2, Thrasher No. 2 and Meek No. 2"; and that "each such purchase was part of an individual joint venture under an agreement by plaintiff Covert to pay his proportionate share of the cost of completion of each said oil well." There were similar allegations as to plaintiffs E. G. Walz and Bernadine Walz. Prior to the institution of the present action the plaintiffs refused to make further payments on drilling costs, repudiated their purchases and contracts and demanded the return of the moneys paid to defendants. During the course of the trial plaintiffs tendered to defendants reassignments covering all of the fractional interests which had been assigned to them in the various leaseholds.

All of the mentioned agreements were signed and the sales and payments made in the State of Missouri, except for Walz's

purchase of and his check for $750 for the working interest in the Jones lease. The trial court found that "the evidence is undisputed that such purchase was made outside the State of Missouri." Much of the evidence of payments was documentary and, as finally submitted, there was little dispute between the parties as to the amount of the several payments which plaintiffs seek to recover, nor was there dispute concerning the correctness of defendants' figures, as such, upon which they base their claim to recover unpaid balances. Plaintiffs claim the amounts indicated in the judgment appealed from, while the defendants claim the amounts indicated in the jury verdict.

The foregoing statement covers the essential facts upon which respondents rely to sustain the judgment below. Appellants, however, as we have indicated, contend that the parties, plaintiffs and defendants in this action were engaged in a series of joint adventures; that joint adventures do not come within "The Missouri Securities Law"; that in any event estoppel applies to cases under the said Securities Act; and that the plaintiffs under the facts in evidence in this case, are estopped to claim a refund of the money invested by them. Appellants rely upon a great mass of detailed facts and circumstances which accompanied the foregoing contractual relationships. Many of these facts are in dispute between the parties. These facts and circumstances cannot be properly reviewed within the limits of this opinion. However, since the appellants contend that "under the facts as found by the jury, the parties here were joint adventurers," we will set out Instruction No. 5. Appellants say there was evidence to support every hypothesized fact submitted by this instruction; and that under the facts here joint adventures are shown and the plaintiffs are estopped to maintain this action. The essential facts upon which appellants rely to support the theory of joint adventure and estoppel are clearly reviewed in the mentioned instruction, as follows:

"The Court instructs the jury that if you find and believe from the evidence that the plaintiffs, defendants Cross and Chasteen, and others who were owners of undivided interests in the various leaseholds referred to in the evidence, joined together in developing oil leases in an effort to discover oil, if so; and if you further find that the contract, under which plaintiffs purchased fractional interests in the Thrasher, Meek and Parker leases mentioned in evidence, was modified at the request of plaintiffs Covert and E. G. Walz, from the form in which originally proposed, said request being that a drilling deadline of February 1, 1956, be affixed and that the drilling of the test wells be continued to the Arbuckle limestone formation; and * * * that while plaintiffs, Covert and E. G. Walz, were personally present at the drilling of one of said wells, they requested the employment of an additional geologist and defendants did employ such an additional geologist; and * * * that said plaintiffs had access to and did examine core samples and electric logs during the course of drilling; and * * * that said plaintiffs made suggestions with respect to the depth of the Thrasher No. 1 well and that such suggestions were accepted and acted upon by defendants; and * * * that said plaintiffs inspected and agreed to invest in the leasehold referred to in evidence as the Padgett or Coe lease, prior to the time that defendants acquired any working interests therein; and * * * that thereafter said plaintiffs took the initiative in calling upon defendants to transfer to them working interests in said Padgett or Coe lease; and * * * that said plaintiffs took the initiative in requesting defendants to transfer to them working interests in the leasehold referred to in evidence as the Jones lease; and * * that said plaintiffs urged the drilling of the Thrasher No. 2 and the Meek No. 2

wells mentioned in evidence, and that defendants, Cross and Chasteen, agreed and contributed thereto; and * * * that at the request of said plaintiffs defendants submitted to them for inspection and approval copies of all invoices for items of expenses; and * * * that said plaintiffs each signed a Joint Operating Agreement in the form shown in evidence with respect to each lease in which each had an interest; and * * * that defendants mailed bulletins to said plaintiffs to advise them concerning progress with respect to the various oil wells in which plaintiffs had interests and that defendants requested authorizations from plaintiffs for expenditure of funds; and * * that plaintiffs were entitled to and did receive payments for oil and gas as produced and sold from each well, proportionate to their respective interests therein; and * * * that defendants, Cross and Chasteen, were obligated to and did share the cost of all expenses except the drilling of the first well on each lease; and * * * that each purchaser from defendants of each proportionate interest in said leases paid an equal proportionate part for his interest in said lease, and the drilling and completion costs thereof, if so; then if you so find, the parties hereto were parties to a series of joint adventures which are not within the provisions of the Missouri Blue Sky Law, and your verdict shall be against the plaintiffs and for the defendants."

The trial court found that "Instruction No. 5 offered by defendants was erroneous in that it (a) submitted facts not in evidence, (b) authorized the jury to find a joint adventure if they found that certain things were done, although those things were done in accordance with the terms of the contract and joint operating agreement, which specifically stated that no joint adventure was created, and thus was contrary to the intent of the parties, and (c) authorized the jury to find a joint adventure relative to certain acts done voluntarily by defendants as distinguished

from obligatory acts done at the direction of the plaintiffs. Therefore, the Court is of the opinion that a joint adventure was not established * * *." As stated, the court, in the alternative, granted a new trial on account of error in giving this instruction.

It is apparent that Instruction No. 5 erroneously directed a verdict for defendants upon a finding of fact which wholly ignored the admitted facts that during the year 1956 the plaintiffs purchased from the defendants fractional working interests in leases on certain real estate on which were drilled the following oil wells: Thrasher No. 1, Meek No. 1, Parker No. 1, Coe No. 1, Jones No. 1, Jones No. 2, Thrasher No. 2 and Meek No. 2, and that each purchase agreement required the payment of funds for the digging of wells and provided that the purchasers pay their proportionate share of the cost of completion of each of said wells; and that none of the mentioned securities were registered as required by statute.

■ As stated, appellants in support of their contention that a verdict should have been directed in their favor on plaintiffs' cause of action first contend that "The Missouri Securities Law" is not applicable to the transactions here, because the parties were all engaged in a series of joint adventures. However, if the conceded facts (also shown by documentary evidence) clearly bring the mentioned transactions within the provisions of the mentioned Act, it is immaterial whether the parties were engaged in a series of joint adventures or whether joint adventures generally are under the Act. The "Blue Sky Laws" of some states by express provision or by judicial decision exempt transactions where the parties are engaged in a "joint adventure." See Gales v. Weldon, Mo.Sup., 282 S.W.2d 522, 527.

■ The fractional working interests in the several oil leases purchased by plaintiffs from the defendants and the contracts en-

tered into were "securities" under the definition of that term as set out in Section 409.020(3) RSMo 1949, V.A.M.S. Gales v. Weldon, supra. Section 409.020(3) defines the term "security" or "securities" to mean "any note; stock; * * * certificate of interest or participation in any profit-sharing agreement; * * * investment contract; * * * fractional undivided interest in oil, gas, or other mineral rights; * * * any certificate, contract, receipt or instrument whatsoever representing or constituting evidence of, * * * title to or interest in any oil, gas or mining lease * * *." The exclusions later mentioned do not apply under the facts here. And see Section 409.030. Appellants Cross and Chasteen and their salesman Otey were engaged in the business of selling these unregistered securities in order to get funds to develop the leases. The transactions were sales of working interests in the several oil leases and contracts with reference thereto. The transactions were not exempt under the provisions of Sec. 409.050. The several transfers of interest were between defendants and the different individual purchasers. Appellants were the only joint adventurers as far as sales were concerned. Until a purchaser had become the owner of a working interest he had no occasion to deal with or enter into any business relationship with any other owner of such an interest. In the case of Gales v. Weldon, supra, under quite similar facts, insofar as the transfer of working interests in oil leases are concerned, the transactions were held to be sales of unregistered securities. We agree with the conclusions there reached.

Appellants, however, would disregard all of the said sales of unregistered securities and the contracts with reference thereto and would start with the facts as they existed immediately after the sales had been made and the contracts entered into, and after each individual purchaser was the owner of an undivided fractional interest in an oil lease. See Instruction 5, supra. Appellants' theory further is that the subsequent conduct of the respondents in dealing with the appellants and the others who had purchased working interests in the several oil leases made the respondents and appellants joint adventurers so as to defeat this action. Appellants Cross and Chasteen had each retained fractional interests in each lease, which interests were exempt from any drilling cost insofar as the first well was concerned, but they were parties to the operating agreements both as operators and non-operators and they paid their proportionate part of completion costs on the several wells.

The subsequent conduct of respondents, as now relied upon, cannot relieve the defendants-appellants from their original sales of these securities, because such subsequent conduct was expressly provided for in and was contemplated by the original sales contracts entered into and because the controlling contracts entered into between the parties expressly excluded any such intent on the part of the parties to enter into a "joint adventure" relationship. The letters confirming the several sales stated that "it is agreed that our respective rights and obligations hereunder are those of independent contractors." The several operating agreements stated "this agreement shall never be construed as creating a joint adventure." Appellants however insist that "the stipulation in the joint operating agreement that there was no partnership or joint venture was intended to apply only as between the Operator and the Non-operators and * * * has no application to the relationship as between the non-operators themselves." Appellants say that "in the joint operating agreement the defendants are shown not only as operators (in their character as the partners * *), but also (in their individual capacities) they are the first two of the non-operators"; and that the "agreements were not carefully drawn so as to reflect this unusual situation in which defendants occupied dual capacities." We think it is clear, both from the letters confirming the several sales of fractional interests in the mentioned leases as well as from the operating agreements,

that a joint adventure was not contemplated between the parties who are now parties to this action. Nor can the subsequent conduct of the parties and their dealings be separated from the sales by the appellants of the mentioned securities. In any case, the facts here bring plaintiffs' case within the Act relied upon, unless plaintiffs are otherwise barred from recovering in this action.

■ Appellants further contend that "the doctrine of estoppel applies to this case under the Missouri Securities Law"; that "under the facts here plaintiffs are estopped to claim a refund of the money invested by them"; and that, if respondents were not estopped as a matter of law on the admitted facts, the issue should have been submitted under defendants' refused Instruction No. 10. This instruction would have submitted a finding that plaintiffs were the moving parties and repeatedly urged the drilling and completion of oil wells, even after certain wells were commercially unproductive; that plaintiffs took the initiative in asking defendants to purchase oil leases and sell them working interests therein, well knowing that other wells were commercial failures; and that " * * * after said wells had been completed and the results ascertained, the leaseholds on which they were respectively located became less valuable; and if you further find that plaintiffs did not demand any return of money from defendants until after all wells had been completed and the results ascertained; and if you further find that said plaintiffs knew that the funds paid by them to defendants would be promptly expended for drilling, completion and operation of said wells; then if you so find, your verdict should be for the defendants."

Section 409.240 RSMo 1949, V.A.M.S., in part, provides: "Every sale or contract for sale made in violation of any of the provisions of this chapter shall be voidable at the election of the purchaser and the person making such sale or contract for sale and every director, officer or agent of or for such seller who shall have participated or aided in any way in making such sale shall be jointly and severally liable to such purchaser in an action at law in any court of competent jurisdiction upon tender to the seller in person or in open court of the securities sold or of the contract made for the full amount paid by such purchaser, together with all taxable court costs and reasonable attorney's fees in any action or tender under this section; provided, that no action shall be brought for the recovery of the purchase price after two years from the date of such sale or contract for sale * * *." The section further provides for deduction of "the amount of any income from said securities that may have been received by such purchaser."

We think it is clear that the theory of estoppel sought to be presented by defendants-appellants would tend to nullify and defeat the very purpose of the statute, which is clearly penal in nature. It is immaterial whether or not there was evidence to support the giving of Instruction No. 10. The Act was passed to protect investors against their own weaknesses and to prevent the happening of such losses as are shown by this record. See Gales v. Weldon, supra; Brown v. Cole, 155 Tex. 624, 291 S.W.2d 704, 711, 59 A.L.R.2d 1011. If plaintiffs' evidence brings their case within the provisions of the statute, they are entitled to recover. The acts relied upon constitute no defense to this action. The court did not err in refusing to direct a verdict for defendants on plaintiffs' claims, or in refusing Instruction No. 10.

In Gales v. Weldon, supra, estoppel was not pleaded and there was no holding that facts, such as are shown by this record, would estop a plaintiff from recovering under the Act. The contention that the plaintiff was in pari delicto with defendants was ruled against the defendants in that case.

■ Appellants further contend that "at the most" the respondents are entitled "to recover only those sums paid by them for undivided fractional interests in the oil

leaseholds, but not the sums paid by them for development of the wells." Defendants' Instruction 12, refused by the court, presented this theory and would have limited the recovery by plaintiff Covert to $400 and plaintiffs Walz to $400, the total amount allotted to lease costs in the several contracts. Appellants cite Section 409.020 (3), apparently, upon the theory that only a fractional undivided interest in each oil leasehold was involved; and that the contracts connected with the sales and providing for development of the leases were not within the Act. Appellants also cite and rely upon Hammer v. Sanders, 8 Ill.2d 414, 134 N.E.2d 509, decided by a divided court. The facts before us on this record sufficiently distinguish this case from the Hammer case and it is unnecessary to discuss either the opinion or the dissent in that case.

We have seen that appellants fixed the alleged value of the fractional interests in the several leases without consulting the purchasers. It was also admitted that the purchasers had to pay the total amount of both the value of the interest in the lease and the drilling cost and sign the several contracts to obtain an assignment of the fractional interests in the several leases. Respondents' recovery in this case cannot be limited as claimed. All payments made in Missouri by the respondents were made for unregistered securities. See Whittaker v. Wall, Court of Appeals, 8 Cir., 226 F.2d 868, 872(4).

■ Appellants further contend that the court erred in setting aside the jury verdict in their favor against respondents Walz on the counterclaim to the extent of $2,467.63 because the Missouri Act does not apply to the Jones transaction since Walz' check for $750, a part payment on the interest in the Jones lease, was delivered in Kansas and the letter confirming the sale was signed by both parties in that state. The assignment must be overruled. We have seen that the jury verdict in defendants' favor on both petition and counterclaim and the judgment based thereon was properly set aside for error in giving Instruction No. 5; and that, in the alternative, a new trial was granted to plaintiffs. However, no recovery could be had in this case by defendants from Walz for any part of the drilling and completion costs on the Jones well because all other contracts and payments connected with the mentioned assignment of an interest in that lease, other than the one mentioned, were made and executed in Missouri. The assignment of a fractional interest in the lease itself was executed, acknowledged and delivered in Missouri. Further, the defendants participated in and aided in that sale in Missouri, since the oral agreement was made in this state, but Otey got the check and had the letter of confirmation signed at the Walz residence in Kansas. The contention is overruled. See Whittaker v. Wall, supra.

■ Appellants' final assignment is that "the court below erred in entering judgment for respondents on their petition notwithstanding the jury verdict without at least providing for the return by plaintiffs of the undivided fractional leasehold interests which had been received by them, *because the judgment as entered deprives defendants of a right conferred by the very statute under which plaintiffs brought suit.*" (Italics ours.) It is admitted that during the course of the trial the plaintiffs tendered to the defendants in open court properly executed and acknowledged reassignments of the several undivided fractional interests in the several leaseholds which they had received from the defendants. The several documents were identified and filed as exhibits in the case. No objection was made to the form of these reassignments, nor to the method by which they were tendered to defendants as provided in Section 409.240, supra. However, there was no provision in the judgment entry directing that these duly executed reassignments of fractional interests in the mentioned oil leases be delivered to the defendants. Nor does the record show that any request for such delivery was ever made.

The judgment is not erroneous on account of the matter complained of since the trial court may yet make such an order upon request, even after the affirmance of this judgment.

The judgment, as entered, is affirmed.

All concur.